Michael William DANIELS, Appellant (Defendant below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 380S66.

Supreme Court of Indiana.

Sept. 9, 1983.
Rehearing Denied Nov. 2, 1983.

Richard Kammen, McClure, McClure & Kammen, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Michael William Daniels, was convicted by a jury of four counts of robbery, Class A felonies, Ind.Code § 35–42–5–1 (Burns 1979 Repl.), one count of attempted robbery, a Class A felony, Ind. Code § 35–41–5–1, § 35–42–5–1 (Burns 1979 Repl.), and one count of felony murder, Ind.Code § 35–42–1–1(2) (Burns 1979 Repl.). The jury recommended a sentence of death for the felony murder count, Ind. Code § 35–50–2–9 (Burns 1979 Repl.), and defendant was thereafter sentenced to four twenty-year terms of imprisonment and one fifty-year term, all to run consecutively, and death.

His direct appeal challenges the legality of the death sentence and presents the following issues for our review:

1. Whether the trial court erred by rejecting defendant's plea agreement on the basis of matters not present in the record;

2. Whether the trial court erred by excusing certain jurors for cause based upon their beliefs concerning the possible imposition of the death penalty;

3. Whether the trial court erred by failing to grant defendant's motion for mistrial due to improper questioning, remarks, and comments on the evidence by the prosecutor during the penalty phase of the trial;

4. Whether our death sentence statute is unconstitutional, and whether it was improperly applied in this case due to the failure of the trial court to make sufficient written findings concerning the sentence;

5. Whether the trial court erred by denying defendant's motion for change of

venue from the county due to prejudicial pretrial publicity;

6. Whether the conviction was unlawful because the state withheld exculpatory evidence and the trial court failed to conduct a hearing on alleged newly discovered evidence; and

7. Whether the trial court erred in allowing the state to amend the charges and add the death penalty request.[1]

A brief summary of the facts from the record shows that on January 16, 1978, defendant and two other individuals committed a series of robberies. The three men drove around residential neighborhoods in Indianapolis and stopped at four different residences where they saw people outside in their driveways. At one residence, a wallet was taken from a man who was shoveling snow and his mother was hit on the face. At another residence, where the father and son were both shoveling snow, defendant shot the father, who died at the scene, and took the son's wallet. At another location, a father and daughter were accosted as they got out of their car, and a wallet and purse were taken. Finally, at a fourth residence, a man who was shoveling snow was accosted by a man with a gun and ordered to freeze. This resident ran towards his garage and turned his dog loose. Defendant fired three shots at this man but he survived.

## I.

Defendant presented a formal plea bargain agreement to the original trial judge in this case at a hearing on November 18, 1978. He agreed to plead guilty to the six substantive counts of the information. In addition, he agreed to receive maximum prison terms on each of the counts and to testify for the state against a co-defendant. In return, the state agreed to dismiss Count VII of the information which was the death penalty request. After the judge heard extensive evidence, he took the offered plea

of guilty under advisement and ordered a presentence investigation report to be prepared. At a hearing on December 13, 1978, the court rejected the plea and set the matter for trial. Defendant now contends that the court's rejection of his plea violated his constitutional rights to waive a jury trial and to be free from double jeopardy and compulsory self-incrimination. He also argues that he has an absolute right to enter a plea of guilty, as long as it is made competently, knowingly, voluntarily, and with advice from counsel, and that the trial court abused its discretion in refusing to accept the plea.

Defendant acknowledges the well-settled proposition that there is no absolute right to have a guilty plea accepted and that a trial court may reject a guilty plea in the exercise of its sound judicial discretion. *Santobello v. New York*, (1971) 404 U.S. 257, 262, 92 S.Ct. 495, 501, 30 L.Ed.2d 427, 433; *Clemons v. State*, (1981) Ind., 424 N.E.2d 113; *Stowers v. State*, (1977) 266 Ind. 403, 363 N.E.2d 978; *Wright v. State*, (1970) 255 Ind. 292, 264 N.E.2d 67; *Stacks v. State*, (1978) 175 Ind.App. 525, 372 N.E.2d 1201. He also acknowledges that the trial court fulfilled its responsibility to determine the factual basis of the plea and whether the plea was voluntarily and knowingly made. *North Carolina v. Alford*, (1970) 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162; *Stowers v. State, supra.*

However, he contends that the court's discretion goes only to the sufficiency of the factual basis of the plea, its voluntariness, and whether there was any abuse of discretion by the prosecutor which harmed the defendant. We find no such limits can be placed upon the court's discretion in accepting or rejecting a guilty plea. The court occupies an impartial position in our judicial system in that it must, as far as possible, protect the interests of all members of our society and provide a neutral forum for the resolution of disputes. In

1. Defendant has submitted a *pro se* request in which he attempted to waive all his rights to the appeal of this case. We do not consider this request to be timely filed since all briefs have been prepared and submitted and oral argument was heard by this Court on the merits of the issues. We therefore have considered all of the arguments raised in this appeal.

criminal cases, the court must protect a defendant from the power of coercion and abuse of the state, but, on the other hand, it must also protect the interests of other members of our society in living in a peaceful, orderly atmosphere where an individual does not have to live in fear of being shot while shoveling snow in his own driveway.

■ In this case, the court carefully considered the evidence presented at the guilty plea hearing and the presentence investigation report. He was aware of the fact that the decedent's widow wanted the plea agreement to be accepted. He stated that he realized that a lot of people had put a great deal of time into arranging the plea, including the prosecutors, the defense attorneys, defendant's family, and the family of the deceased. The record shows that he considered all of the circumstances involved in this case for over a month and was especially concerned that the victim's widow, Mrs. Streett, had strongly concurred with the plea arrangement and would be subjected to further emotional stress if the case went to trial. Furthermore, the record shows that the court wanted to have the widow present in the courtroom when he made the determination to reject or accept the plea. When he found out that she wouldn't be available at that time, he talked to her the day before the hearing was scheduled.

Defendant argues that since the judge talked to a person interested in the case without his or his counsel's knowledge, his constitutional rights to confrontation and cross-examination of the witnesses against him were violated. However, the record shows that Mrs. Streett did not actually witness any of the crimes and defendant did not cross-examine her at the trial. The judge stated that the discussion with Mrs. Streett was about her desire that the plea agreement be accepted which was beneficial rather than prejudicial to defendant's position. While we do not condone the court's action in holding an *ex parte* discussion with Mrs. Streett, we find the defendant has not shown how he was prejudiced under the circumstances of this case. We have

often held that this Court cannot assume that bias or prejudice exists, but must rely upon the record to show evidence thereof. *Clemons v. State, supra; Kleinrichert v. State,* (1973) 260 Ind. 537, 297 N.E.2d 822.

■ In this case, we find that the record shows that the court was not acting with bias or prejudice against defendant when he rejected the guilty plea, but was concerned with affording the proper credibility and respect to the death penalty statute as a law which had been passed by the General Assembly on behalf of all the citizens of the state. The judge expressed his conclusions in the following words:

"I do want to apologize to Mrs. Streett and the prosecutors and Mr. Bowman and Mr. Cobb. I know that you've worked hard on this, but as I said, I think the interest to be served transcends our own time that we have spent on this. I spent an hour and a half in a guilty plea, too, and you may be right and I would expect you to take whatever steps are necessary to make that determination, but as I said, I—if I accepted the plea, it would be just because of convenience, not because I sincerely believe that it's right. I sincerely believe that I must reject the guilty plea. If we're going to have any semblance of rationality or a rational import from a statute passed by the legislature, I can't think of another case that would more warrant the death penalty than this case, and if we're going to have it on the books, then it should be up to the other members of society composed of a jury and a judge to make that decision."

We find no clear abuse of discretion in the rejection of the guilty plea here, since it was within the trial court's discretion to reject the plea. There was no further prejudice from this issue as the case was subsequently tried before a different judge after the judge involved with the guilty plea hearing had retired.

## II.

Defendant next contends that the trial court erred in excusing five jurors for cause after voir dire examination disclosed their

views concerning capital punishment. These jurors gave some equivocal answers but all were questioned further before they were excused over defendant's objections.

■ The United States Supreme Court set out the standard to be followed on voir dire in death penalty cases in *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. The Court held that the jury impartiality to which a criminal defendant is entitled precludes a state from carrying out a sentence of death if the jury that imposed or recommended the death penalty "was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777, 20 L.Ed.2d at 785. Only when a venireman is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings" can he be struck for cause. 391 U.S. at 522–23 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21. Indiana has followed this decision in *Lamar v. State,* (1977) 266 Ind. 689, 366 N.E.2d 652, and *Monserrate v. State,* (1971) 256 Ind. 623, 271 N.E.2d 420.

It has been clearly recognized that the *Witherspoon* standard can present a dilemma to the trial court when some of a juror's answers about his belief in the death penalty are equivocal. It is then the duty of the trial court to pursue the matter further until it is established that the juror is "irrevocably committed" to vote against the death penalty. *Lamar v. State, supra.* In this case, each of the five jurors who gave equivocal answers was then further questioned until an unequivocal answer was established. One of the five prospective jurors, Delores Riley, stated that she didn't believe in capital punishment because of her religious beliefs. The prosecutor then questioned her further:

Q. "Well, I understand that, but are you saying you could never vote for a recommendation of a death penalty

even though the State proved beyond a reasonable doubt—"

A. "—no, because I wouldn't want that on my hands."

Q. "Then under absolutely no circumstances, even if you were instructed on the law by the judge, you're saying under no circumstance could you vote for a recommendation of the death penalty?"

A. "No, I couldn't, because I couldn't live with myself if I did."

After defendant's objection to this juror's proposed exclusion, the court personally questioned Mrs. Riley further and finally asked these questions:

Q. "Do you understand that you would not be voting for the death penalty or against the death penalty, but that you would be voting to recommend or to not recommend the death penalty?"

A. "I don't believe I could."

Q. "That the ultimate decision would not lie with you, that you are simply making a recommendation to the Court, do you understand that?"

A. "Pardon?"

Q. "Do you understand that you would only be making a recommendation?"

A. "It all adds up to I couldn't vote for someone to be put to death (unintelligible)."

\* \* \* \* \* \*

Q. "Okay. No matter what the law is and no matter what the judge instructs you?"

A. "No, because I'm—the Lord says he's the only one that judges and I couldn't."

Q. "So in essence, you wouldn't be able to follow what the judge told you to do?"

A. "Well, no, because I don't think I could—"

Q. "—no matter what, you would never vote for a death penalty, no matter what the judge instructed you?"

A. "No, I couldn't because I wouldn't want to have to live with that."

We find that the totality of the questioning here did establish that this juror was irrevocably committed to vote against the death penalty.

Prospective juror Norman Sparks stated that the only way he could kill somebody would be in defense of himself or his wife and children, "but I couldn't—I couldn't do it any other way." He was further questioned by the prosecutor:

Q. "Are you telling me that no matter what you could never vote for a death penalty?"

A. "I couldn't."

Q. "You can't think of any murder situation in which you might recommend death?"

A. "Well—"

Q. "—no matter how aggravating it might be?"

A. "I've heard some pretty bad ones, and I think people that commit them ought to be in prison for the rest of their life, but I don't believe that gives anybody the right to actually kill anybody, to take anybody's life. I don't believe you can do that."

He was also further questioned by the court which finally concluded:

Q. "—do you have such a conscientious opinion or feeling against the death penalty that you could not follow the Court's instructions [on the law] and you could not, in fact, bring in a recommendation for the death penalty?"

A. "That's right."

This juror's answers also show he was unequivocally opposed to the death penalty.

Another juror, Franklin Hardy, was asked what he thought about the death penalty and he said: "Well, I disagree just like probably—just trading a life for a life, you know." He then stated that he did not believe in the death penalty. He was questioned further and specifically asked if he could think of any circumstances in which the death penalty might be warranted.

Hardy then said he thought that maybe in the case of the assassination of a president or in child molesting cases the death penalty would be appropriate. He was informed that the death penalty would not apply in child molesting cases and after more lengthy questioning the court concluded with the following questions:

Q. "Are you telling me that you would not be able to follow and find the law as it is in the State of Indiana?"

A. "No, Ma'am."

Q. "Then other than the president you can't think of any instances or any circumstances involving a murder that you would feel would warrant recommendation of the death sentence?"

A. "No."

Q. "And your feelings would preclude you from recommending the death penalty if the Defendant was found guilty, is that right?"

A. "Yes, Ma'am."

Defendant points out that the word "preclude" is ambiguous and that the California Supreme Court has found that it was error to excuse a juror based upon an affirmative answer to a question such as that put to juror Hardy in this case utilizing the word "preclude." *People v. Williams,* (1969) 71 Cal.2d 614, 79 Cal.Rptr. 65, 456 P.2d 633. However, in the instant case, juror Hardy's position against the death penalty was unequivocally stated at the beginning of his voir dire and remained unequivocal throughout the voir dire testimony. Any ambiguity caused by the court's use of the word "preclude" is adequately covered by the firm unequivocal position which the totality of Hardy's questioning reveals.

Another juror, Charles Harpe, did not give a firm answer when he was first questioned about his position on the death penalty. He said at first that it would "be hard" for him to vote in favor of putting somebody else to death. The court gave him some time to think about his position and later he was questioned by both the prosecutor and the court at length. Final-

ly, the court concluded with the following questions:

Q. "Okay. If the judge instructs you on the law as it exists and you were convinced by the evidence that the State of Indiana had proven beyond a reasonable doubt the existence of an aggravating circumstance and that that outweighed any mitigating circumstance are you telling me you couldn't follow the judge's instruction and recommend a death penalty?"

A. "No, I don't think so."

Q. "Well, you don't think so or do you know? You just couldn't?"

A. "Right."

Q. "No matter what the judge instructed?"

A. "Right."

\* \* \* \* \* \*

Q. "Mr. Harpe, are there any circumstances in which you think you might reasonably recommend the death penalty?"

A. "No."

Q. "You feel there are no circumstances ever that it would justify it?"

A. "I just don't think I could live with myself."

Q. "Well, whether you could live with yourself or not, are there any circumstances that you feel would justify the death penalty? Supposing you were not the one that was to make the recommendation—do you feel that there are circumstances that would warrant the death penalty?"

A. "No."

Q. "None?"

A. "No."

These final answers show that this juror had made up his mind that he was unequivocally opposed to the death penalty.

Finally, juror, Joseph Raymond, stated unequivocally at the beginning of his voir dire that he did not believe in the death penalty. Although Raymond added to some of his later answers the phrase, "I don't think so," he was further questioned by the court and finally concluded:

Q. "Mr. Raymond, you have stated in Mr. Emery's questioning that you didn't believe that you could. I'd like to ask you if you feel there are any circumstances that you could possibly think of that would warrant the recommendation of a death sentence, irrespective of whether you think you might be required to be the one that would recommend it? Can you think of any circumstances that you feel would warrant this?"

A. "No, Ma'am, I don't. I think life is very precious."

Q. "And so therefore you feel that the taking of another life does not justify the taking of that life?"

A. "No, Ma'am."

Q. "And there are no circumstances that you can think of that you would ever think that the death sentence was warranted?"

A. "No, Ma'am."

Q. "And because of these beliefs then and your opinions that you would be unable to ever recommend the death penalty in any set of circumstances?"

A. "I would not, Ma'am."

These answers show that Raymond was unequivocally opposed to the death penalty.

We have thoroughly examined the record of the voir dire in this case and find that both the prosecutor and the court continued questioning these five jurors who gave some equivocal responses to questions about their position on the death penalty. We find that the totality of the questioning in this case showed that all of the five jurors were unequivocally opposed to the death penalty.[2] The record shows that the trial

2. We note that other jurisdictions have found no satisfactory proof that death-qualified juries are unrepresentative of the community or are unduly biased in favor of conviction. The guar- antee of an impartial jury means that the jury panel must be able to be fair to both the state and the accused. *See Fielden v. State,* (1982) Ind., 437 N.E.2d 986.

court fulfilled the duties imposed upon her by *Witherspoon*, and the totality of the questioning shows that it would be flying in the face of common sense to say that any of these jurors was not irrevocably committed to vote against the death penalty. We find no error here.

### III.

■ Defendant next alleges that the court erred by failing to grant his motion for mistrial based upon the allegedly improper conduct of the prosecutor during the penalty phase of the trial. Our standard of review on this issue is well settled. The granting of a mistrial is within the sound discretion of the trial court and its determination will be reversed only where an abuse of that discretion can be established. *Ramos v. State*, (1982) Ind., 433 N.E.2d 757; *Abrams v. State*, (1980) Ind., 403 N.E.2d 345; *Blackburn v. State*, (1979) 271 Ind. 139, 390 N.E.2d 653.

During the penalty phase of the trial, defense counsel called defendant's mother as a witness. She testified concerning defendant's youthful age, his lack of education, and that his I.Q. was below normal, but that she felt her son could be rehabilitated. She also said that to her knowledge her son had never been convicted of any criminal offense. She did recall one time when he went to juvenile court in connection with a burglary charge but she knew that the case was dismissed. She finally concluded that "Michael has never caused me any trouble. Okay? Michael's biggest problem was in school. He was a slow learner ...."

■ On cross-examination, the prosecutor asked if the juvenile court incident involved the "robbery of a purse at a laundromat?" There was an objection and some discussion about whether the incident mentioned was on defendant's record, and then a motion for mistrial was made. Further discussion between both counsel and the court was held outside the presence of the jury. When the jury returned, the court admonished them in the following manner:

"At this time, I would admonish the jury to disregard the last comments of Mr. Goldsmith concerning any other charges that may have been pending against the Defendant. You are not to consider that in any way."

It is clear that the judge took prompt action here to cure any error which the improper questions might have raised. We have consistently held that the trial judge is in a better position than are we to determine the impact of any improper conduct by the prosecutor. If a jury is admonished by the trial court to disregard what has occurred at trial, or if other reasonable curative measures are taken, no reversible error will ordinarily be found. *Rose v. State*, (1982) Ind., 437 N.E.2d 959; *Page v. State*, (1980) Ind., 410 N.E.2d 1304; *Abrams v. State*, supra.

■ Further questioning of defendant's mother established that she did not remember any juvenile court conviction for burglary but only remembered another time when charges against her son had been dismissed. Since she had clearly stated that her son had no juvenile court convictions and had gone into great detail about the one court appearance when the charges were dismissed, the state was properly allowed on cross-examination to impeach her testimony by showing that defendant had one actual conviction for burglary.

■ The state also introduced as rebuttal evidence a certified copy of the file on defendant's burglary conviction. There was no objection to the introduction of this exhibit but some disagreement about whether it should be passed to the jury or read. When the prosecutor proposed only to read a portion of it, defense counsel requested that all of it be read. We find no error here since defendant's own witness brought up the details of the robbery incident which was dismissed and which led to the confusion about whether or not there was an actual prior conviction. Furthermore, defendant did not object to the introduction of the certified copy of the file of the burglary conviction so any error in this

regard is waived. *Ballard v. State,* (1974) 262 Ind. 482, 318 N.E.2d 798.

Finally, defendant contends that the prosecutor made improper remarks during his final argument in the sentencing portion of the trial. He argues that the prosecutor's comments upon the possibility that defendant might be out of prison by the time he was forty-one years old, due to good time credit if he was not given the death penalty, as well as references to the sentences which his accomplices received, were extremely prejudicial. He also argues that the prosecutor unnecessarily dramatized the evidence when he characterized the defendant as "sentencing" the victim to death before he actually pulled the trigger. He also complains about the prosecutor's references to the lack of any evidence of remose by defendant and his re-emphasizing of defendant's prior conviction. However, the record shows that there was no objection to any of these remarks at the time they were made and this failure to raise a specific objection results in a waiver of the issue as error for review. *Pavone v. State,* (1980) Ind., 402 N.E.2d 976, *Womack v. State,* (1978) 270 Ind. 8, 382 N.E.2d 939. In addition, these remarks were responsive to the evidence presented. Defendant did present witnesses on his behalf so the comments about lack of evidence of his remorse cannot be construed as a direct or indirect reference to his failure to testify. *Fortson v. State,* (1978) 269 Ind. 161, 379 N.E.2d 147. We find no reversible error here.

### IV.

Defendant next argues that Indiana's death penalty statute is unconstitutional on its face and as applied in this case. He asks us to reconsider our previous finding that the statute does not violate the Eighth Amendment proscription against cruel and unusual punishment or Article 1 § 18 of our Indiana Constitution which provides that the penal code shall be "founded on the principles of reformation, and not of vindictive justice." He also contends the statute is invalid because this Court has not adopted specific rules of review for death penalty cases.

We have dealt with all of these allegations in previous cases in which we found that our death penalty statute, Ind.Code § 35-50-2-9 (Burns 1979 Repl.), was not unconstitutional *per se,* as being in derogation of either the Eighth Amendment to the United States Constitution or Article 1, § 16 of the Indiana Constitution. *Williams v. State,* (1982) Ind., 430 N.E.2d 759, *appeal dismissed,* (1982) —— U.S. ——, 103 S.Ct. 33, 74 L.Ed.2d 47; *Brewer v. State,* (1981) Ind., 417 N.E.2d 889, *cert. denied,* (1982) —— U.S. ——, 102 S.Ct. 3510, 73 L.Ed.2d 1384; *Judy v. State,* (1981) Ind., 416 N.E.2d 95. The procedural scheme set out in our statute limits the imposition of death sentences so as to insure that they will not be inflicted arbitrarily or capriciously in accord with the decisions and opinions of the United States Supreme Court. *Gregg v. Georgia,* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida,* (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas,* (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929.

We have previously compared our statutory and procedural requirements with those found in the Florida and Georgia death penalty statutes which were upheld by the United States Supreme Court. We found that our present statute is very similar to the Florida statute but that Indiana is more restrictive than Florida in applying the death penalty. *Brewer v. State,* 417 N.E.2d at 898. We found that our death sentencing procedures are consistent with and in full compliance with the requirements set forth by the United States Supreme Court in *Proffitt* and *Gregg.*

Still, defendant here argues that Indiana does not engage in a meaningful appellate review of death sentences because he argues we have never adopted "specific" rules for review of death penalty cases. It is true that the rules adopted by this Court govern the appellate review of all sentences and do not apply exclusively to the death penalty. Ind.R.Ap.Rev.Sen. 1 and 2. However, several additional factors do apply.

Our statutes provide that all death penalty sentences are automatically given an expedited review by this Court, a complete sentencing hearing is held, and the sentencing judge must submit written findings including a statement of the reasons for selecting the sentence that is imposed. Ind.Code §§ 35–50–2–9, 35–4.1–4–3 (35–50–1A–3) (Burns 1979 Repl.). These provisions guard against the influence of improper factors at the trial level and facilitate meaningful appellate review.

As we stated in *Williams:*

"We find that our rules do provide for an adequate and meaningful appellate review.

\* \* \* \* \* \*

"[Our] standard places the emphasis of review on the specific circumstances of each case and the nature of each individual defendant. Our review is facilitated by the written statement of the trial court's sentencing decision but also includes a thorough consideration of the facts presented by the entire record. The entire review procedure is adequate to assure that any decision to impose the death sentence is based upon reason and the specific offense and the character of the offender."

*Williams,* 430 N.E.2d at 765. Our entire sentencing procedure and review adequately protects each individual's constitutional rights.

■ Defendant further argues that the statute should be found unconstitutional because it does not provide that the determination of the weight to be accorded aggravating and mitigating circumstances should be "beyond a reasonable doubt." The statute provides in pertinent part:

"(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds:

"(1) That the state has proved beyond a reasonable doubt that at least one [1] of the aggravating circumstances exists; and

"(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

"The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation."

Ind.Code § 35–50–2–9(e) (Burns 1979 Repl.).

It is well settled, as defendant points out, that our constitution protects an accused against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re: Winship,* (1970) 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375. Our statute follows this proscription and provides that the state must prove beyond a reasonable doubt the existence of at least one of the enumerated aggravating circumstances. However, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a "fact" which must be proved beyond a reasonable doubt, but is a balancing process. An accused person's rights are fully protected because this determination is made by the jury and is not the final sentence but is only a recommendation. Both the trial court and this Court must thoroughly review this determination before a sentence of death can be given.

Furthermore, in the instant case, the trial court gave the following instruction as her Final Instruction No. 1:

"If after a consideration of all the evidence herein, you and each of you are convinced thereby beyond a reasonable doubt that defendant Michael Daniels on January 16, 1978, did intentionally kill Major Allan H. Streett with a handgun while defendant was committing the crime of robbery and if you are further convinced by the evidence beyond a reasonable doubt that any mitigating circumstances that existed are outweighed by the foregoing aggravating circum-

stances, the form of your recommendation may be:

" 'We, the jury, recommend the defendant Michael Daniels shall suffer the death penalty as provided by law.' "

This instruction adequately provided that the jury would follow the beyond a reasonable doubt standard in both finding the existence of the aggravating factor and in the weight determination process.

■ Defendant's next contention is that the death sentence is disproportionate and excessive in his case since the aggravating circumstance relied upon was that the murder was committed during the commission of the crime of robbery and it was possible that the jury made no finding that defendant intentionally acted to take a human life. The above cited instruction clearly shows that the jury *was* instructed to find an "intentional" taking of human life before recommending the penalty of death, so defendant's argument in this respect is not applicable. He further contends, however, that our statutes concerning murder and robbery have a built-in arbitrariness since they both include the phrase "knowingly or intentionally" and the jury might have determined at the guilt portion of the trial that he had a "knowing" rather than an "intentional" state of mind. We find that the above cited instruction given at the penalty phase of the trial was adequate to insure that the recommendation of the death penalty was based upon the finding of an "intentional" mental state.

■ Along with our review of defendant's final contention that the trial court's written findings as to the reasons for imposing the death penalty are not sufficient, we will also thoroughly review the appropriateness of that sentence under the evidence in this case. In our review of the imposition of the death penalty, we must consider whether the established guidelines and statutory procedures have been followed and whether the nature of the offense and the character of the defendant have been specifically considered. Our review is facilitated in this case by the arguments presented by both sides to us in open

court on December 8, 1982. We find that all of the statutory procedures were followed in the trial and sentencing of this defendant. Proper and complete instructions were given at both phases of the trial. During the guilt determination phase of the proceedings, the jury found beyond a reasonable doubt that defendant intentionally killed the victim while in the perpetration of robbing the victim. A separate sentencing hearing was held following the guilt determination at which time defendant presented evidence in his own behalf. By a written, unanimous verdict, the jury returned a recommendation that defendant be sentenced to death.

The trial judge then considered all the evidence in the case, including the undisputed evidence that defendant was the person who had carried and used the gun during the robbery spree. The judge considered the jury's recommendation and the aggravating circumstance and mitigating circumstances presented before she held a final sentencing hearing. The judge also considered two presentence reports filed by the probation officers, which showed the prior juvenile and adult criminal history of the twenty-one year old defendant. At the final sentencing hearing both parties again had an opportunity to present evidence to the judge. No new evidence was presented by either side but defendant did express his concern over the quality of the representation given him by his two attorneys. The judge responded that both men were "two of the best," were very competent attorneys, and did an excellent job of representing defendant during his trial. She then sentenced defendant on all counts.

■ However, the original record of this case did not contain a transcript of the sentencing hearing or the written findings and conclusions regarding the imposition of the death penalty. The state filed a petition for writ of certiorari to supplement the record of the proceedings and we therefore ordered the court to transmit a supplemental record containing a transcript of the sentencing hearing and the written findings of the trial court specifying the reasons for

selecting the sentence imposed in accordance with our statute, Ind.Code § 35–50–2–9 (Burns 1979 Repl.). We subsequently received the transcript of the sentencing hearing and the nunc pro tunc entry of the findings of fact and judgment of the court in imposing the death penalty. This procedure of ordering a nunc pro tunc entry, effective the date of the sentencing hearing to be made by the trial court has previously been approved in death penalty cases, as well as other cases involving enhanced sentences. *Schiro v. State,* (1983) Ind., 451 N.E.2d 1047 (1983); *Judy v. State,* 416 N.E.2d at 110–111; *Alleyn v. State,* (1981) Ind., 427 N.E.2d 1095, 1099.

Defendant objected to the petition for writ of certiorari on the basis that he should have had the opportunity to be present when the court entered the written findings of fact and he now renews this argument. We find no merit to this argument as it is clear the nunc pro tunc entry was not a new decision but was an entry made of something which was actually previously done and not set out in the proper form. Defendant had ample opportunity to present evidence at the sentencing phase of the trial before the jury and again at the final sentencing hearing before the trial judge. Furthermore, he has had ample opportunities to contest the appropriateness of the written findings in his briefs to this Court and at the oral argument heard before this Court. We find no constitutional provisions which would demand more than these opportunities to present evidence and arguments concerning his sentencing.

█ We have reviewed the trial court's nunc pro tunc entry and find that it does meet the requirements of Ind.Code § 35–50–2–9 for a statement of reasons for imposing the death penalty.[3] The judge found that one of the statutory aggravating

**3.** "FINDINGS OF FACT AND JUDGMENT OF THE COURT IMPOSING DEATH PENALTY

"Comes now Patricia J. Gifford, Judge, Marion Superior Court, Criminal Division, Room 4, and pursuant to order of the Indiana Supreme Court dated August 17, 1981, enters the following findings, *nunc pro tunc* for date of September 14, 1979:

"This matter comes on for sentencing hearing, the jury, on August 24, 1979, having found the defendant, Michael Daniels, guilty of Count I, Robbery; Count II, Felony Murder; Count III, Robbery; Count IV, Robbery; Count V, Robbery; Ct. VI, Attempt Robbery. The defendant present in person and by counsel Merle Rose and William Wurster, and the State by Marcus Emery and Stephen Goldsmith. The Court having considered all the evidence, the presentence investigation report and the arguments of counsel, now makes the following findings:

"1. The State proved beyond a reasonable doubt that the defendant Michael Daniels, intentionally killed the victim, Allen Street [sic], while attempting to commit a robbery, as alleged in Count VII.

"2. The jury, in a bifurcated hearing on Count VII, after considering all the evidence in aggravation and mitigation, found the aggravating circumstances outweighed the mitigating circumstances, and recommended the defendant suffer the death penalty.

"3. The victim was shoveling snow in front of his residence and was unarmed when shot by the defendant in the presence of his teenage son.

"4. The victim offered no resistence [sic] to the defendant and did not provoke the shooting.

"5. The defendant committed multiple robberies on the same night as he shot the victim, both before and after the shooting.

"6. The defendant shot and wounded Dr. R.W. Barnett on the same evening he killed Allen Street [sic], inflicting serious bodily injury on Dr. Barnett while in the commission of a robbery.

"7. The defendant has a prior criminal history.

"8. The evidence presented in mitigation was the fact the defendant was a slow learner.

"The Court, therefore, finds that the imposition of less than the maximum sentence would be a mockery of the seriousness of these crimes and that the aggravating circumstances outweigh the mitigating circumstances.

"THEREFORE, the court imposes the death penalty on Michael Daniels, and ORDERS he [be] put to death in the manner prescribed by law, before sunrise on Friday, the 28th of March, 1980."

Although the conclusions are phrased in terms of plural aggravating and mitigating circumstances, when only one statutory aggravating circumstance was proved, the entire statement does set out the specific details necessary to show that all the facts surrounding the crime, as well as the nature and character of the defendant, were carefully considered and that the sentence was not arbitrarily or capriciously imposed.

circumstances had been proved beyond a reasonable doubt and that the jury had returned a recommendation for the death penalty. The judge also considered the specific facts of the instant crimes and the character of defendant. The only evidence of any possible mitigating circumstance was testimony that defendant was a slow learner and the trial judge found that this did not outweigh the aggravating circumstance. We find that the trial court in all respects properly followed the required procedures in imposing the sentence of death.

Furthermore, we find ample evidence in the record to support the jury's finding that defendant intentionally killed the victim while committing a robbery. Additionally, the murder was part of a spree in which at least three other victims were robbed and one other victim was seriously injured. All of the victims were approached when they were in their own driveways or yards and none was previously acquainted with defendant. Defendant had a prior criminal history and presented no facts in mitigation except that he was a slow learner and had not caused his mother any trouble. An examination of the entire record in this case clearly supports the conclusion that the imposition of the death penalty was determined by the nature of the offense and the character of the defendant. This consideration and our finding that the trial court complied with the proper procedures throughout the case supports our conclusion that the sentence of death recommended by the jury and imposed by the trial court was not arbitrarily or capriciously arrived at, and is not manifestly unreasonable.

### V.

Defendant next contends that the trial court abused its discretion by denying his motion for change of venue from the county due to prejudicial pretrial publicity. The Court held a hearing on this motion about a month prior to the start of the trial. Defendant presented fifteen newspaper articles which had appeared in Indianapolis newspapers during late April and early May of 1979. These articles primarily covered the trial of Donald Cox, a co-defendant, but did contain some description of the details of the crime.

Defendant acknowledges that he was not entitled to an automatic change of venue and would only be entitled to the change if he could show just cause. Ind.R. Crim.P. 12; Ind.Code § 35–1–25–4. It is clearly established that a trial court's denial of a motion for change of venue in a case such as this is reviewed only for abuse of trial court discretion. *Pallett v. State,* (1978) 269 Ind. 396, 381 N.E.2d 452; *Mendez v. State,* (1977) 267 Ind. 309, 370 N.E.2d 323. This Court has further held that the trial court must balance the rights of the news media, the defendant, and the citizens as it determines the right to change of venue. *Pallett,* 269 Ind. at 399, 381 N.E.2d 452; *Brown v. State,* (1969) 252 Ind. 161, 247 N.E.2d 76.

In the instant case, the newspaper articles consisted of factual accounts of the co-defendant's trial and do not show a pattern of underlying prejudice throughout the community. They appeared approximately four months before defendant's trial started. It is clearly not necessary to a fair trial that the jurors be totally ignorant of the facts involved. *Williams v. State,* (1979) 270 Ind. 426, 386 N.E.2d 670. The defendant has failed to establish that there was a clear and convincing buildup of prejudice against him throughout the community. Under the circumstances of this case, we find no abuse of discretion by the trial court in denying defendant's motion for change of venue.

### VI.

Defendant next argues that the state withheld certain exculpatory evidence and destroyed some items of evidence and that it was error for the trial court to deny his motion to suppress. The record shows that defendant, Kevin Edmonds, Don Cox, and Paul Rowley gave tape-recorded statements to the police shortly after the crimes were committed but prior to defendant's arrest.

The police department re-used these tapes, but transcriptions of the statements made by Don Cox and Kevin Edmonds were made and given to defendant. Defendant was able to interview the police officers who were present when the statements were given. Furthermore, neither Cox nor Rowley testified at the trial and defendant was provided with a summary of Edmonds's longest statement even though it was considered attorney work-product.

■■■ It is true that negligent destruction or withholding of material evidence by the police or the prosecution may present grounds for reversal when the evidence is material either to guilt or punishment. *Rowan v. State,* (1982) Ind., 431 N.E.2d 805; *Birkla v. State,* (1975) 263 Ind. 37, 323 N.E.2d 645. In this case, defendant had access to adequate copies and summaries of the relevant evidence. Furthermore, the state's case was based principally upon the testimony of eyewitnesses and not upon the testimony of the co-defendant Edmonds. There is no basis for holding that the trial court erred in denying defendant's motion to suppress.

■ After the instant trial, defendant filed an affidavit alleging that he had learned of certain exculpatory evidence concerning the truthfulness of the witness Edmonds. He stated that he had just learned that the state had evidence that Edmonds had told a cellmate that the murder weapon was in the hands of Paul Rowley and that the state had not furnished this evidence to him. This evidence is clearly only impeaching evidence and not of the type which probably would produce a different result on retrial in view of the overwhelming eyewitness testimony. Furthermore, the state submitted a counter affidavit which set out the facts known to the state. It was not necessary for the court to hold a hearing on this issue since sufficient facts were presented in the affidavit to show that defendant had failed to sustain the standard

of proof necessary to gain a new trial as set out in our case law.[4] *Bryant v. State,* (1979) 270 Ind. 268, 385 N.E.2d 415; *Norris v. State,* (1976) 265 Ind. 508, 356 N.E.2d 204; *Bradburn v. State,* (1971) 256 Ind. 453, 269 N.E.2d 539.

### VII.

■ Defendant finally contends that the court erred by allowing the state to amend the information and file the request for the death penalty after he had already been arraigned on the other six counts. It has been clearly settled that our statute allows the amendment of an indictment or information by the prosecutor at any time as long as the defendant is accorded an adequate opportunity to prepare his defense commensurate with such changes. Ind. Code § 35–3.1–1–5 (Burns 1979); *Pavone v. State,* (1980) Ind., 402 N.E.2d 976, *Highsaw v. State,* (1978) 269 Ind. 458, 381 N.E.2d 470. Here the information was amended three months after the original six counts were filed, but defendant still had fifteen months to prepare his defense before the trial began. This gave him adequate opportunity to prepare for trial and we find no error here. Although defendant was not arraigned on this death penalty count, he has waived any error in this respect by his failure to object prior to trial. Ind.Code § 35–4.1–1–1 (Burns 1979 Repl.).

The judgment of the trial court is affirmed in all things; the cause is remanded to the trial court for the purpose of fixing a date for the death sentence to be carried out.

GIVAN, C.J., and PIVARNIK, J., concur.

DeBRULER and PRENTICE, JJ., concur and dissent with opinion.

DeBRULER, Justice, concurring and dissenting.

A prospective juror cannot be properly excluded because of his views regarding the

---

4. Both the issues of the negligent destruction of evidence and allegedly newly discovered evidence were raised by the co-defendant Cox in his trial and both were decided adversely to defendant's position in Cox's appeal. *Cox v. State,* (1981) Ind., 419 N.E.2d 1279, 1281, 1284–1285.

propriety of the penalty of death unless he is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings," *Witherspoon v. Illinois,* (1969) 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776. After taking the seeming unalterable position that he could not impose the death penalty under any circumstances, prospective juror Hardy, under questioning by the court backed off. Under prodding by the court's questions, he began a process of deeper personal reflection upon his own conscience. This led to the discovery that he would deem the penalty of death appropriate for assassination of the president. Further reflection resulted in his arriving at the belief that the death penalty would be proper for child molesting. After properly precipitating this process by her questioning, the trial judge suddenly terminated it and finished the questioning of Mr. Hardy with the following two questions:

"Q. Then other than the president you can't think of any instances or any circumstances involving a murder that you would feel would warrant recommendation of the death sentence?

A. No.

Q. And your feelings would preclude you from recommending the death penalty if the Defendant was found guilty, is that right?

A. Yes, Ma'am.

COURT: We will show that the juror is excused for cause."

The Hardy voir dire questioning at the beginning shows a mind irrevocably committed to vote against the penalty of death come what might. That standing alone would have warranted dismissing him for cause. It did not stand alone, as subsequent inquiry by the court showed an open mind, a mind willing and capable of self-analysis. He engaged in the process of developing and forming new beliefs and convictions, as he sought to understand and truthfully answer the court's questions. He

rejected absolutely his irrevocable commitment against the death penalty, and commenced the process of forming a new and more refined commitment. He began to define a class of cases in which he could find the imposition of the death penalty acceptable. The class included assassination of the president. That is a type of murder. The charge to be tried was a type of murder. The class also included child molesting. It would be fair to say that most people would regard child molesting as a lesser crime than murder. When, then, the trial court abruptly terminated her questioning with the two questions quoted above, it is no longer possible to conclude from the questioning as a whole that Mr. Hardy was "irrevocably committed" to vote against the death penalty. It was therefore constitutional error to exclude Mr. Hardy for cause because of his views on capital punishment, and as a consequence the penalty of death must be set aside.

I vote however to affirm the conviction.

PRENTICE, Justice, concurring and dissenting.

I concur in the majority opinion upon issues 1, 3, 4, 5, 6 and 7 but dissent with respect to issue 2. I, therefore, vote to affirm the conviction of the defendant (appellant) upon the crimes charged but would order the sentence of death vacated and order a new trial upon that issue.

Upon Issue 2, the majority has determined that the trial court did not err in excusing, for cause, five prospective jurors who expressed themselves as being firmly opposed to the imposition of death sentences. The majority said:

"The record shows that the trial court fulfilled the duties imposed upon her by *Witherspoon,* and the totality of the questioning shows that it would be flying in the face of common sense to say that any of these jurors was not irrevocably committed to vote against the death penalty. We find no error here." (Majority op. at pp. 168–169)

In this respect, the majority has misconstrued, and consequently misapplied the holding of *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

If any one prospective juror was improperly excused upon the basis of his or her feelings about capital punishment, the death sentence must be vacated. *Davis v. Georgia,* (1976) 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (per curiam). A correct review of the law and the record reveals that all five excused prospective jurors assigned as error were excused improperly. Consequently, the sentence of death in this case cannot stand.

We must first establish the parameters of *Witherspoon.*

In *Adams v. Texas,* (1979) 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 the Court summarized its prior cases in this area:

"As an initial matter, it is clear beyond peradventure that Witherspoon is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Id.* at 47–48, 100 S.Ct. at 2528, 65 L.Ed.2d at 591.

"This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 45, 100 S.Ct. at 2526, 65 L.Ed.2d at 589.

Thus it may be seen that a proper analysis of a *Witherspoon* claim should begin with a determination of the duties of the jurors and the instructions appropriate thereto. The duty of the jury in the sentence hearing phase of a death penalty case is to consider the evidence and (1) determine whether or not the State has proved beyond a reasonable doubt that at least one of the statutorily prescribed aggravating circumstances existed, (2) determine whether or not mitigating circumstances that exist, if any, are outweighed by the aggravating circumstance or circumstances and (3) recommend to the court whether or not the death penalty should be imposed. Ind.Code § 35–50–2–9(e). There is no requirement for the jury to recommend a death sentence under any circumstances. This is obvious from the clear wording of sub-section (e): "The jury *may* recommend the death penalty only if it finds: * * *." (emphasis added) and is further evidenced by sub-section (c)(7) which authorizes the jury to consider, in the penalty determination phase, "*Any other circumstances appropriate for consideration.*", as a mitigating circumstance. (emphasis added). In *Hoskins v. State,* (1982) Ind., 441 N.E.2d 419, 430 (Prentice, J., Hunter, J., dissenting), I made the following observation about this statutory scheme:

"Additionally, the wording of the Indiana Statute, Ind.Code § 35–50–2–9(e) (Burns 1979) does not appear to bind the conscience of the jurors but provides only that the jury *may* recommend the death penalty under certain prescribed circumstances. It is not altogether illogical to conclude, therefore, that although a juror finds facts warranting the death penalty and no mitigating circumstances whatsoever, he *may,* nevertheless, recommend against imposing it without violating his oath." (emphasis in original).

Under the statute and our case law, a juror who is unalterably opposed to capital punishment could, nevertheless, abide by his oath, because there is no duty imposed upon him to recommend a penalty of death under any circumstances. This conclusion is inescapable from the use of the word "may" in the standard to be applied provided by subsection (e), from the authorization to consider the all encompassing "any other circumstances appropriate for consideration" provided by subsection (c)(7) and from the relegation of the jury's recommendation to an advisory status only recently approved by this Court in *Schiro v. State,* (1983) Ind., 451 N.E.2d 1047. There is simply nothing

to bind the conscience of jurors with respect to the death penalty potential, and one who holds conscientious scruples against such penalties is under our statute and case law, no more disqualified to serve in a capital case than he would be in a non-capital case.

It must also be noted that none of the five prospective jurors who were excused for cause relative to this issue was asked if his viewpoint on the death penalty would affect his capabilities to consider the evidence and the instructions of the court and to determine defendant's guilt in accordance with the evidence and the law.

Further, none of such prospective jurors was even asked if, despite his opposition to the death penalty, he would hear the evidence and vote for a recommendation authorized by the evidence and the statutory standards; and none was told that whatever the recommendation of the jury, it was not binding upon the court. Consequently, each of the five provided answers to questions that were largely irrelevant under mistaken impressions, engendered by the trial court's and the prosecutor's questions, concerning the nature of the death penalty statute and the jurors' obligations thereunder. The trial court's error is accented by a consideration of the instruction she subsequently gave. This instruction, though by no means perfect, does parallel the statutory provision:

"If after a consideration of all the evidence herein, you and each of you are convinced thereby beyond a reasonable doubt that defendant Michael Daniels on January 16, 1978, did intentionally kill Major Allan H. Street with a handgun while defendant was committing the crime of robbery and if you are further convinced by the evidence beyond a reasonable doubt that any mitigating circumstances that existed are outweighed by the foregoing aggravating circumstances, the form of your recommendation *may* be: 'We, the jury, recommend the defendant Michael Daniels shall suffer the death penalty as provided by law.' * * *." R. at 302.

It does not, however, as evidenced by the record, parallel the questions posed to the prospective jurors.

Prospective juror Sparks, who perhaps was the most adamant in his expressed opposition to the death penalty, asked "— what is the duty of a jurist?" The judge's statement and question that followed the inquiry was not responsible:

"Q. Mr. Sparks, you have stated that you were opposed to the death penalty. If the Court should instruct you in the event that you were a member of the jury and in the event that there was a finding of guilty of the Defendant as to the charge of murder, if the Court further instructed you that the law provides that in the event the State of Indiana proves beyond a reasonable doubt one of the aggravating circumstances, and it— the proof outweighs any mitigating circumstances that may be proven, do you have such a conscientious opinion or feeling against the death penalty that you could not follow the Court's instructions and you could not, in fact, bring in a recommendation for the death penalty?

"A. That's right." R. at 585–86.

Under the statute, the judge's hypothetical is not a correct statement of the law. Even if the juror found that the aggravating circumstance outweighed the mitigating circumstance beyond a reasonable doubt, he could, nevertheless, have recommended mercy and remained faithful to his oath.

The trial court repeated the error with prospective juror Riley but received a different answer:

"Q. Mrs. Riley, are you telling the Court that if you were instructed that if the State of Indiana—if the Defendant had been found guilty and you proceeded to the sentencing part of the trial and if they proved beyond a reasonable doubt and—that you would not be able to follow the instructions of the Court and you would not uphold your oath as a juror?

"A. Well, I just couldn't vote for the death penalty.

"Q. So you're saying that you would not follow the Court's instructions, is that right?

"A. Well, if that's what it is." R. at 592–93.

A discussion ensued between defense counsel and the court in which counsel asked if the court were going to instruct the jury that it had a vote for the death penalty. The court never answered counsel's question, although the answer should have been an unequivocal "no." The examination of Mrs. Riley continued, and although the court attempted to have Mrs. Riley's position clarified she continued to answer ambiguously; however, it is apparent that she understood exactly what the trial court was telling her:

"Q. You are not—you are telling me that you would not follow the Court's instructions?

"A. I don't understand. This is my first time here as a—at a jury duty, and I don't quite understand. The only thing is when—as I say that I'd have to vote for a death penalty—I couldn't—." R. at 596.

Mrs. Riley could not have known that the only logical inference to be drawn from the court's statement, i.e. that the jurors may be duty bound to vote to impose the death penalty, was incorrect. Subsequently, the Prosecutor, again oblivious to the statutory standard, backed Mrs. Riley into a corner:

"Q. All right. Now, I think what the judge is trying to find out and what I'm trying to find out is that you as a juror are going to take an oath to follow the law, to find the law and the facts as they are. Okay? Not as you want them to be. Our legislature enacted a death penalty. Okay. That said this is a penalty that the State may seek by charging that the Defendant committed a certain aggravating circumstance, and the one which we have alleged is that he intentionally killed someone during the course of a robbery, and the law says that we must prove that beyond a reasonable doubt to you, and that it must outweigh any mitigating circumstances in your mind. Okay? And it's your job as a juror to determine whether or not the State has done that, and if we have done that then it's your job as a juror to vote to recommend a death penalty. If the judge instructs you that that's the law, could you do it?

"A. No, I don't think I could. I don't think I could vote for a death penalty.

"Q. Okay. No matter what the law is and no matter what the judge instructs you?

"A. No, because I'm—the Lord says he's the only one that judges and I couldn't.

"Q. So in essence, you wouldn't be able to follow what the judge told you to do?

"A. Well, no, because I don't think I could—

"Q. —no matter what, you would never vote for a death penalty, no matter what the judge instructed you?

"A. No, I couldn't, because I wouldn't want to have to live with that." R. at 597–98.

The judge excused Riley upon the ground that "she's indicated that she would not follow the Court's instructions under any circumstances." This is not accurate. Mrs. Riley only stated that she would not follow instructions, which if given, would have been patently erroneous.

Prospective juror Harpe did not think he could live with himself and did not think he could recommend the death penalty under any circumstances; however, it is apparent that Harpe thought, erroneously, as the others did, that he might have to recommend the death penalty. Such a state of affairs is not the law and therefore, his answers do not furnish a basis for a challenge for cause.

Prospective juror Hardy eventually expressed opposition to capital punishment except as to cases of a presidential assassination or child molesting. He virtually stated that he would not impose it in this case; however, he too was never properly apprised of his obligation as a juror:

"Q. Okay. And if the judge instructed you regarding the law and the facts in this case and the death penalty, you couldn't follow the judge's instruction, I take it, regarding the death penalty?

"A. No.

"Q. And that being the law in Indiana you just disagree with it, I take it?

"A. I disagree with it.

"Q. You couldn't follow it.

"A. No." R. at 642.

We are left to wonder what law the Prosecutor was discussing; however, it appears from the context, he understood the law to be that which had already been imparted several times, i.e. a mandate to recommend the death penalty if the jury found the alleged aggravating circumstance and that it outweighed such mitigating circumstance, if any, that might be found.

Finally, while prospective juror Raymond stated that he, unalterably, would not recommend the death penalty under any circumstances, it was again done under the erroneous belief that he might be required to do so.

Viewing the record in its totality, I can only conclude that the prospective jurors equivocated because of the imprecise manner in which they were examined. Except in the case of Mrs. Riley, the equivocation miraculously ceased each time the prospective juror realized that, contrary to the statute, mercy might not be a viable and lawful alternative to the imposition of the death penalty.

The burden was upon the State to demonstrate that these five jurors were excused because they would not abide by their oaths. *Adams v. Texas, supra.* That burden has not been met. Not one of the five excluded jurors ever stated or implied that he or she could not do what would be required of him as a juror in this case. As a result, Defendant was tried by a death qualified jury in violation of his due process rights under the United States Constitution and the Constitution of this State. Accordingly, I vote to set aside the sentence of death and to remand the case for a new sentencing hearing. In all other respects, the judgments of conviction and sentences should be affirmed.