Michael William DANIELS, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 49S00–9411–SD–1079.

Supreme Court of Indiana.

Jan. 12, 2001.

Mark Earnest, Eric K. Koselke, Indianapolis, Indiana, Attorneys for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## ON APPEAL FROM THE DENIAL OF SUCCESSIVE PETITION FOR POST–CONVICTION RELIEF

SHEPARD, Chief Justice.

Michael William Daniels was convicted of felony murder, attempted robbery, and four counts of robbery arising out of a crime spree in Indianapolis on the evening of January 16, 1978. He was sentenced to death on the felony murder count. In this appeal from the denial of his successive petition for post-conviction relief, Daniels contends that (1) his trial counsel were ineffective; (2) the attorney who filed his motion to correct error was ineffective; and (3) counsel from the first post-conviction proceeding was ineffective. We affirm the denial of post-conviction relief.

### Factual and Procedural Background

On January 16, 1978, Daniels and two other individuals committed a series of crimes. *Daniels v. State*, 453 N.E.2d 160, 164 (Ind.1983). The three men drove

around residential neighborhoods in Indianapolis and stopped at four different residences where they saw people outside their homes. *Id.*

Shortly after 8 p.m., Steve McCloskey was shoveling snow in his driveway at East 52nd Place in Indianapolis when he heard a gunshot. (T.R. at 756, 760–61.) His mother came out of the house carrying a broom. (T.R. at 761.) Two men then approached McCloskey and said, "This is a stick-up. Don't you move. I have a gun on you." (T.R. at 762.) Daniels, the gunman, ordered McCloskey to drop his snow shovel and hand over his wallet, which McCloskey did. (T.R. at 764, 766.) McCloskey's mother tried to knock the gun out of Daniels' hand with her broom, and Daniels hit the woman on the jaw. (T.R. at 766.) Both intruders then fled. (T.R. at 767.)

At the second residence, fifteen-year-old Timothy Streett and his father Allen were shoveling snow at approximately 9:30 p.m. (T.R. at 791–92, 812.) Two men came up behind Timothy and one said, "Don't move and no one will get hurt." (T.R. at 799.) Timothy turned and saw Daniels waving a gun at him. (T.R. at 799–800.) Daniels ordered Timothy and his father to hand over their wallets. (T.R. at 800.) When the father responded that he did not have his wallet with him, Daniels shot and killed him. (T.R. at 800, 817.) Timothy handed his wallet to the other intruder, who then fled with Daniels. (T.R. at 800–01.)

The perpetrators then accosted Jack Beem and his daughter Mary Ann. Jack had picked Mary Ann up from work at about 10:10 p.m. (T.R. at 827–29.) As they arrived at home and got out of their car, Jack heard footsteps and a voice crying out, "Don't move, don't move, this is a hold-up." (T.R. at 829.) Daniels took Jack's wallet at gunpoint and a second man took Mary Ann's purse. (T.R. at 829–31, 847.)

Finally, at a fourth residence, Dr. Robert Barnett took his dog outside and began to shovel snow at about 11 p.m. (T.R. at 863–64.) Daniels, who was holding a gun, ordered Barnett to freeze. (T.R. at 868, 873.) Barnett turned and walked toward the house and Daniels shot him once, then twice more after Barnett started swinging his snow shovel at Daniels. (T.R. at 869–70.) Barnett survived.

Each of the six surviving victims testified at Daniels' trial. When the prosecutor asked Steve McCloskey if there was any question in his mind that Daniels was the perpetrator, he responded, "No question. I see his face every night when I go to bed." (T.R. at 767.) McCloskey's mother, whose vision was poor, was unable to confirm or rebut her son's identification. (T.R. at 788.)

On cross-examination, defense counsel questioned McCloskey in detail about his original description to the police of the perpetrators. McCloskey described the gunman to police as a light-complexioned fifteen- to sixteen-year-old African–American, around 5′8″ tall and 150 pounds, wearing a stocking cap.[1] (T.R. at 771, 776–77.) Counsel pointed out that, although McCloskey cited the gunman's hazel eyes and separated front teeth as particularly distinctive features, McCloskey omitted these details from that original description. (T.R. at 781.) Counsel then obtained McCloskey's admission that, at an earlier trial,[2] he had described the gunman as 4′8″ tall. McCloskey explained that he meant to say 5′8″. (T.R. at 772).

The second robbery victim, Timothy Streett, testified at trial that he saw "Mi-

---

1. Daniels' arrest records described him as African–American, nineteen years old, 5′6″ tall and 118 pounds, slender, with brown eyes. (S.P–C.R. at 1289.)

2. Although he did not specify, McCloskey was presumably referring to the trial of Donald

Cox, who drove the "getaway car" and who was convicted and sentenced to ninety years for his participation in the crimes for which Daniels was also charged. (T.R. at 1116, 1119.)

chael Daniels, the man right there" shoot and kill his father. (T.R. at 803.) In lineups a few weeks after the crime, Timothy identified both Daniels and Paul Rowley, who resembled Daniels, as subjects he "suspect[ed] to be involved in [his] particular incident." (S.P–C.R. at 2963–66.) When asked on cross-examination if he had previously identified Rowley "as a person involved in [the crime] in any way," Timothy responded, "I never positively identified anybody until I identified Mr. Daniels at the line-up. I said that there was a possibility, but I never positively did it." (T.R. at 810.)

Jack and Mary Ann Beem were also asked at trial if they could identify Daniels. Jack testified that "[t]here's someone in this court that resembles him very much. A positive identification, I would not say." (T.R. at 831.) However, when Mary Ann was asked if there was any question in her mind that Daniels was the man who had robbed her at gunpoint, she responded, "No, there is not." (T.R. at 856.) On cross-examination, defense counsel challenged Mary Ann's identification, because she had originally described the gunman as tall, and McCloskey had described the gunman as standing 5'8". (T.R. at 851.) Mary Ann responded that to her, 5'8" was tall. (Id.) Counsel then questioned Mary Ann's description of the gunman's cap, because Mary Ann described it as having no bill and Timothy Streett had described the shooter as wearing a cap with a small bill. (T.R. at 809, 852.) Defense counsel also elicited testimony that during at least part of the robbery, Mary Ann was farther away from the gunman than Jack was, and pointed out that Jack could not make a positive identification. (T.R. at 853–55.)

Robert Barnett was the final victim to testify. When reminded of the "seriousness of the charges" in the case and asked if there was any doubt Daniels was the person who shot him, Barnett responded, "I have no doubts. I know that he's the one." (T.R. at 899.) On cross-examina-

tion, defense counsel pointed out that Barnett made only a tentative identification when he first viewed an array of twelve to twenty mug shots several weeks after the incident. (T.R. at 883–84, 890.) Counsel also questioned Barnett in detail about how similar the photographs were, and whether anyone had suggested which photograph Barnett should identify as that of the perpetrator. (T.R. at 890–92.)

In addition to these victim eyewitness identifications, the State presented the testimony of Kevin Edmonds, who admitted that he accompanied Daniels on all four robberies. Edmonds testified that he, Donald Cox, and Daniels were together on the evening of January 16, 1978. (T.R. at 967–69.) Cox drove the trio to his house, went inside, and came back to the car with a gun. (T.R. at 970.) Cox handed the gun to Daniels, who responded, "Let's make some money." (Id.) Edmonds then recounted details of the crime spree that were consistent with the victims' accounts. (T.R. at 970–80.)

Edmonds testified that in each of the four robberies Daniels was the only one armed with a gun. (Id.) Edmonds stated that Daniels had the gun stuck down in his pants "[t]hrough a belt or something." (T.R. at 971.) As the two men approached McCloskey's home, Daniels tried to pull the gun out of his pants. (Id.) He instead pulled the gun's trigger and the bullet grazed his leg. (Id.) (McCloskey testified he heard a gunshot just before he was accosted. (T.R. at 756, 760–61.)) A later witness established that when Daniels was arrested eleven days after the series of crimes, he had a small abrasion on his left femur or thigh about three-quarters of an inch long, "like a scab had formed over it." (T.R. at 1065.)

Edmonds confessed to police on February 6, 1978, and was later released on bond. (T.R. at 986–87.) He entered into an interim plea agreement with the State on December 29, 1978. (T.R. at 990–91.) The agreement, which was admitted into evidence at Daniels' trial, provided that

Edmonds would "testify credibly" for the State at the trials of Cox and Daniels. (*Id.*) In exchange for this testimony, the State agreed to forego prosecuting Edmonds for felony murder. (*Id.*)

Daniels' counsel cross-examined Edmonds at length about his release on a $350 bond despite a pending murder charge, and about his plea agreement with the State. (T.R. at 1002–11.) Counsel also asked about a statement Edmonds made to the police, before he named Daniels as the shooter, implicating Paul Rowley in the crimes. (T.R. at 1005–06.) Edmonds explained that Rowley "was pointing a finger at me, saying that I had did it, and I said, 'How do you know [Rowley] didn't do it, since he knows so much about it?"' (T.R. at 1038.) Edmonds also testified that, after the robberies, Daniels gave the gun back to Cox who in turn gave it to Rowley. (T.R. at 1037.)

The jury found Daniels guilty on all six counts. It recommended a death sentence for the felony murder count, finding that the State proved an aggravating circumstance (that Daniels intentionally killed while committing the crime of robbery) and that any mitigating circumstances were outweighed by that aggravating circumstance. (T.R. at 302, 305.) The trial court imposed a death sentence. (T.R. at 320.) This Court affirmed the convictions and sentence on direct appeal. *Daniels,* 453 N.E.2d at 175.

In February 1984 Daniels filed a petition for post-conviction relief that included several claims, including that trial counsel rendered ineffective assistance in both the guilt and penalty phases of the trial. *Daniels v. State,* 528 N.E.2d 775 (Ind. 1988). The post-conviction court denied relief, and this Court affirmed that denial. *Id.* at 776, 784. Daniels petitioned the U.S. Supreme Court for certiorari, and the Supreme Court remanded the case for re-

consideration in light of its then-recent decision in *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). *Daniels v. Indiana,* 491 U.S. 902, 109 S.Ct. 3182, 105 L.Ed.2d 691 (1989). On remand, we held that the *Gathers* rule did not apply retroactively in collateral attacks on pre-*Gathers* proceedings and affirmed the denial of post-conviction relief. *Daniels v. State,* 561 N.E.2d 487, 492 (Ind.1990). In 1991, Daniels filed a pro se petition for post-conviction relief that was denied. (S.P–C.R. at 106–07.) Another pro se petition was dismissed in 1993. (S.P–C.R. at 114–23, 146–47.)

On November 22, 1993, assisted by appointed counsel, Daniels filed the petition at issue in this appeal. (S.P–C.R. at 164, 175.) Daniels contended that the trial court was bound by a 1978 plea agreement that it signed but then rejected on the record at the sentencing hearing a month later. *State v. Daniels,* 680 N.E.2d 829, 831 (Ind.1997). The post-conviction court granted summary judgment in favor of Daniels on this claim, and the State appealed. *Id.* This Court reversed the grant of summary judgment and remanded the case to the post-conviction court to address the remaining issues in Daniels' petition. *Id.* at 885. After a hearing, the post-conviction court denied relief, and this appeal ensued.[3] (S.P–C.R. at 56, 94.)

## I. Ineffective Assistance of Trial Counsel

Daniels' principal claim in this appeal is that his trial counsel rendered ineffective assistance in both the guilt and penalty phases of his trial. (Appellant's Br. at 1.) Daniels' guilt phase contention focuses on trial counsel's failure to use information suggesting that Paul Rowley may have been one of the perpetrators, and perhaps the shooter. *Id.* His penalty phase contentions are based on the alleged failure of trial counsel to investigate and present mitigating evidence as well as the failure

---

**3.** Though the dissent complains that we have placed "too high a premium on finality," diss. at 1191, the foregoing demonstrates that Indiana's courts have hardly leapt to judgment in Mr. Daniels' case. On the contrary, we have spent twenty-three years litigating it.

to argue that the death penalty was inappropriate because the possibility of Rowley's involvement raised a "residual doubt" that Daniels was the shooter. (*Id.* at 1, 62.)

*A. Guilt Phase.* The State's theory at trial was that Daniels, Edmonds, and Cox committed the robberies. Daniels now contends that trial counsel failed to use a wealth of available information suggesting that Rowley, not Daniels, was the gunman.[4] Daniels points to a number of specifics. Rowley and Cox were charged with a robbery involving a similar modus operandi, committed four days before these offenses.[5] Timothy Streett initially identified both Rowley and Daniels as possible participants. Mary Ann Beem identified Daniels in a line-up only after his picture had appeared in the newspaper. (S.P–C.R. at 2653, p. 15.) She later called a deputy prosecutor and stated that she was "not real sure anymore" about the identification, but nonetheless confidently identified Daniels at trial. (S.P–C.R. at 2647, p. 25, ex. 6.) As already explained, before Edmonds implicated Daniels, he told the police that Rowley's knowledge of the robberies suggested that Rowley participated in them.

In a polygraph interview of Rowley two weeks after the crimes, the examiner detected "deceptive responses." According to the polygraph report, Rowley subsequently admitted that he was involved in the first robbery. (T.R. at 367–1 through 367–7.) However, it is unclear precisely what this confession means and the audiotape of the interview no longer exists.[6]

Rowley was initially charged with Allen Streett's murder. (S.P–C.R. at 2902.) According to the probable cause affidavit, this charge was based on Timothy Streett's identification of Rowley "as being with the person" who shot his father. (S.P–C.R. at 2903.) The record does not

---

4. Daniels does not suggest that the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to disclose exculpatory information. Rather, Daniels contends that his trial counsel did not use information available to adequately investigate and to properly question certain witnesses at trial.

5. Rowley was convicted of that earlier crime. *Rowley v. State,* 271 Ind. 584, 394 N.E.2d 928 (1979). His conviction was ultimately reversed, however, when this Court held that a witness who had been hypnotized in an effort to enhance his memory of the crime, and who was central to the State's case, did not have a sufficiently independent basis for his identification of Rowley. *Rowley v. State,* 483 N.E.2d 1078, 1083 (Ind.1985). The only other direct evidence in that case was testimony by Kevin Edmonds, who also testified against Daniels in this case. *Id.,* (T.R. at 964). There, as here, Edmonds testified as part of a plea bargain. *Rowley,* 483 N.E.2d at 1083, (T.R. at 990–1).

Daniels, in a 1984 petition for post-conviction relief, sought a reversal on similar grounds because Timothy Streett was hypnotized in an effort to enhance his recall of the shooter's appearance. *Daniels,* 528 N.E.2d at 776. We denied relief because Streett had an independent basis for his in-court identification that was untainted by the hypnosis. *Id.* at 779. Furthermore, Streett was only one of several eyewitnesses who testified to the various crimes charged, and Edmonds' plea arrangement was fully disclosed to the jury so that they could consider it in weighing Edmonds' credibility. (T.R. at 990–1, 1004.)

It is unclear from this record whether Cox was convicted.

6. Although the audiotapes of the polygraph interview were erased, the report notes that Rowley stated that he, Cox, and Edmonds "stuck someone up (note: the victim beat [Edmonds] off with a b[r]oom). The elements of this crime (the broom) occurred on the same night of the shooting under investigation...." (T.R. at 367–4.) Daniels further contends that Rowley "confessed" in that same interview "to having the gun ... in his possession on the night of the shooting. Further results of the tests showed that he did shoot someone on the night of January 16, 1978." (Appellant's Br. at 50.) This language appears in handwritten notes dated January 30, 1978 that were attached to a deposition admitted into evidence at the post-conviction hearing. (S.P–C.R. at 2647, ex. 2.) The deposition was that of a detective who stated that the handwriting "appear[ed] to be" his. (S.P–C.R. at 2647, p. 14.) However, we note that this Court has consistently held that polygraph evidence is inadmissible, absent a stipulation by both parties. *Smith v. State,* 455 N.E.2d 346, 352 (Ind.1983).

reveal why charges against Rowley were ultimately dropped. A warrant was issued for a search of Rowley's home for the gun used in the Streett murder. (S.P–C.R. at 1637–38.) Although no gun was recovered, shell casings fired from the same gun as the shell casings found at the murder scene and at the scene of the fourth robbery were found. (S.P–C.R. at 1514.)

Daniels contends that his trial counsel were deficient for failing to use all of this information at trial because, but for these omissions, there is a reasonable possibility he would have been acquitted. The State responds that "[a]lthough a more vigorous defense might have persuaded the jury that one or another of the victim's identifications was not sufficiently positive to be reliable, it is simply not credible that they were all wrong." (Appellee's Br. at 8.)

The State correctly points out that the evidence relating to the four robberies is intertwined.[7] The common thread is the testimony of Edmonds. If the jury believed Edmonds, all of the convictions, including identification of Daniels as the shooter, follow.[8]

Moreover, the jury was presented with other reliable evidence sufficient to find that Daniels was the shooter. Steve McCloskey, the first victim, identified Daniels as the man who took his wallet and struck his mother. McCloskey also testified that he heard a gunshot at about the time that Edmonds said Daniels shot himself in the leg. Timothy Streett, the victim of the second robbery, testified that Daniels shot his father.

Mary Ann Beem identified Daniels as the gunman who robbed both her and her father. Jack Beem found Timothy Streett's wallet when he searched for his own wallet at his home where this third robbery occurred. Dr. Barnett, the victim of the fourth robbery, also identified Daniels as the person who shot him. Shell casings found at the Barnett and Streett crime scenes were fired from the same gun.

The successive post-conviction court was critical of trial counsel's failure to make use of the evidence relating to Rowley, but concluded:

> 48. Although trial counsel was not as thorough nor effective in hindsight as they should have been, and in several areas they did a deplorable job, it is the Court's finding that with the remaining body of evidence that the State presented, trial counsel's representation did not fall below the norms for trial counsel at the time, so as to have made the jury's finding of guilty unreliable.

> 49. Although the Petitioner has shown that trial counsel's performance was lacking and ineffective, he has not carried his burden that such performance prejudiced the defense to the extent that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

(S.P–C.R. at 85–86.) Thus, the post-conviction court rejected Daniels' guilt phase contentions on their merits. It went on to hold, however, that Daniels' claim of trial counsel ineffectiveness was unavailable in this successive post-conviction petition because it was raised and adjudicated in his first petition for post-conviction relief.[9]

---

**7.** Police officer Paul Koss, a firearms identification expert, only testified about shell casings found at the scene of the Streett murder and the Barnett robbery. (T.R. at 943, 945, 959.) Although his police report discusses the casings found at all three locations, (S.P–C.R. at 1514), Koss was not asked about the casings found at Rowley's home.

**8.** Cox was tried separately, before Daniels. Edmonds testified, and the jury found Cox guilty of all counts. *Cox v. State,* 275 Ind. 688, 419 N.E.2d 1279 (1981).

**9.** Although the specific items argued in Daniels' successive petition were not argued in his first petition, issues relating to Timothy Streett's identification of Daniels were raised at that hearing and addressed in this Court's opinion affirming the denial of post-conviction relief. We stated:

(*Id.* at 89.) The court was correct to so hold.

*B. Residual Doubt at the Penalty Phase.* All of the robbery victims testified that they saw two robbers and only one wielded a gun. (T.R. at 767, 799, 830, 847, 871.) Edmonds testified that he was with Daniels, who carried the gun throughout the evening, while Cox remained in the car. (T.R. at 970–79.) The State's theory of the case was that Daniels, Edmonds, and Cox were the only participants in the crime spree. Daniels argues that the cited evidence suggesting Rowley's involvement created at least a "residual doubt" as to whether Daniels was the shooter, and that Daniels' trial counsel were ineffective for failing to make a penalty phase argument based on residual doubt. (Appellant's Br. at 59.)

As we recently observed in *Miller v. State*, 702 N.E.2d 1053, 1069–70 (Ind.1998), "counsel ought have no obligation to argue to the jury that its just-returned unanimous determination of guilt ought be revisited.... The failure to argue 'residual doubt' does not constitute ineffective assistance of counsel." Therefore, the failure here, if any, was in omitting to present, in the guilt phase, the evidence suggesting that Daniels was not the shooter. As noted above, this claim was raised in the first post-conviction proceeding and is, therefore, foreclosed under res judicata.

■ *C. Res Judicata and Waiver.* This case thus presents the dilemma between the dual goals of ending litigation and ensuring only proper imposition of the death penalty. The errors claimed here, unlike those asserted in Daniels' earlier appeals, deal with whether Daniels was the shooter, and thus whether he was properly found eligible for the death penalty.

The items cited by Daniels establish neither his innocence nor his ineligibility for

the death penalty. At most, they individually and collectively present inconsistencies in the accounts of some of the testifying victims, and evidence potentially implicating Rowley as a co-perpetrator, and as such may have been worthy of pursuit by the defense. The question is whether these modest inconsistencies and the hints concerning Rowley are so ·weighty that they warrant vitiating a generation's worth of fact-finding and litigation that points in the opposite direction. The events are now more than twenty years in the past. Rowley is dead. (S.P–C.R. at 2458.) Edmonds did not testify at the post-conviction hearing and the record does not indicate his current availability. Apart from the usual considerations of cost and court resources, requiring victims and their families to revisit these awful crimes is itself no small matter.

Perhaps most significantly, all of these matters were known or knowable both at trial and at the time of Daniels' first post-conviction proceeding. Therefore, the post-conviction court correctly held that Daniels' new claims of trial counsel ineffectiveness were barred by res judicata and waiver. As this Court observed in our last opinion in this case, "[t]he Indiana Rules of Procedure for Post–Conviction Remedies require that all grounds for relief available to a petition[er] under the post-conviction rules must be raised in the original petition." *State v. Daniels*, 680 N.E.2d 829, 835 n. 10 (Ind.1997) (citing Ind. Post–Conviction Rule 1(8)).

[T]he issue of effectiveness of both Daniels' trial and appellate counsel was extensively litigated and appealed in his first postconviction proceeding· nine years ago. *Daniels v. State*, 528 N.E.2d 775, 779–81 (Ind.1988). The issues raised by Daniels in this appeal were on the face of the record from the time of

---

Clearly a decision was made [by trial counsel] to concentrate on discrediting Edmonds rather than Timothy Streett in order to avoid alienating the jury with extensive cross-examination of the victim's fifteen- year old son. The propriety of this decision will not be questioned based on hindsight. Even if the strategy were poor, it does not rise to the level of ineffective assistance. *Daniels*, 528 N.E.2d at 779.

his trial. Accordingly, consideration of additional issues bearing on trial or appellate counsel's ineffectiveness that were available at that time is precluded. *Id.* *See also Baum v. State,* 533 N.E.2d 1200, 1201 (Ind.1989) ("If a convicted person wishes to challenge the performance of his defense counsel at a trial upon criminal charges, he may do so. If such challenge is included in the second petition for post-conviction relief, the claim then is properly subject to waiver or *res judicata.*"); *Resnover v. State,* 547 N.E.2d 814, 816 (Ind. 1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 175 (1990) (In his first petition for post-conviction relief, "Resnover did raise the issue of ineffectiveness of counsel who handled his trial and his direct appeal and the issue was decided adversely to his petition. He was not entitled to be heard on this issue in this second petition. . . .").

We must mean what we say in our rules, that a defendant is entitled to one post-conviction hearing and one post-conviction opportunity to raise the issue of ineffectiveness of trial counsel in the absence of newly discovered evidence or a *Brady* violation. Viewed in hindsight, any trial could have been handled differently. As time passes it becomes increasingly speculative why a given strategy was or was not employed.

Although the evidence related to Rowley might have helped Daniels' defense, none of these lines of inquiry except for Timothy Streett's identification were addressed either at trial or as examples of ineffective trial assistance at the first post-conviction proceeding. This did reflect upon the level of effort by trial counsel, but there are many other possible reasons why these matters might have been of no value to the defense. One obvious example is that Rowley, against whom the murder charge was not pursued, may have had an airtight alibi. We recognize that there is nothing in the record to support this conjecture, but Daniels likewise offers largely speculation that Rowley was a participant. We mention it only to illustrate the difficulty in evaluating, two decades later, the reasons for and effects of available lines of inquiry that were not pursued.

In sum, we reaffirm the sound and long-established principle that considerations of finality preclude re-litigation of previously available contentions in successive post-conviction proceedings.

*D. The Claims Were Available in Prior Proceedings.* Daniels nevertheless argues that res judicata or waiver should not apply to his ineffective assistance of counsel claims because the issue raised in this petition "was not ascertainable or available to him" in his prior petition. (Appellant's Br. at 77.) His argument pertains to his personal knowledge rather than that of his post-conviction attorney.

Daniels further contends that his post-conviction counsel refused his request to raise other claims of trial and appellate counsel ineffectiveness. (Appellant's Br. at 80.) Finally, and in a similar vein, he asserts that "[a]ny waiver of his right to present a full claim of ineffective assistance of trial counsel claim was not knowing[ly], voluntarily and intelligently made on the part of Daniels." (Appellant's Br. at 81.) In support of this argument, he points to two pro se filings and a brief colloquy between himself and the first post-conviction court.[10]

---

10. Daniels also contends that these assertions are supported by a motion to correct error that was prepared but never filed by Paul Levy, the deputy state public defender who represented him at his first post-conviction hearing. Levy's motion stated:

At Petitioner's request, counsel would additionally represent here that he has not undertaken to investigate or raise certain other issues in these proceedings, contrary to Petitioner's explicit demands. These issues pertain to the following: . . . (iii) That Petitioner did not have access to items of evidence requested by Motion to Compel Discovery, dated June 20, 1978, and, accordingly, was without the assistance of counsel to ascertain other instances of error in his case, despite Petitioner's request

A review of those filings and that colloquy does not answer the question whether the potential involvement of Rowley in these crimes was among the issues Daniels urged his first post-conviction counsel to pursue. On the eve of his first post-conviction hearing, Daniels filed a pro se "Motion to Withdraw Petition of Post Conviction Relief," which alleged that he could not get his attorney to investigate "matters concerning this case," that he could not convince counsel to "obtain evidence that has been kept from the defendant's knowledge for six (6) years," and that the evidence requested from his counsel was "listed from 1 to 71" in the motion to compel discovery filed on June 20, 1978. (P–C.R. at 140.) [11] The list of seventy-one items, which was compiled by the State, itemized the materials provided to Daniel's counsel in partial compliance with Daniels' previous motion for discovery filed in March 1978. (*See* T.R. 26–29, 59–66.) Among the items included in the list were Edmonds' police statement, records of seized or recovered property, polygraph reports, criminal histories, probable cause affidavits, and reports of lineup results. (T.R. at 62–65.)

The first post-conviction court began the hearing by discussing this motion with Daniels. Daniels told the court that he "wanted to present other errors, I have been trying to present them for the past four years, and I'm constantly getting these excuses from these attorneys...." (P–C.R. at 350–51.) The post-conviction court asked Daniels the nature of the evidence he wanted to present, and Daniels mentioned the list of seventy-one items. (P–C.R. at 352.) The court asked counsel about the evidence he planned to present,

that present counsel obtain this evidence listed in the Motion to Compel. Petitioner requested that counsel obtain this evidence on August 7, 1984 in order to further investigate error in his trial proceedings to be raised in the Post–Conviction Petition, but counsel refused to do so.
(S.P–C.R. at 1983.) Levy's motion was never filed because Daniels retained an attorney to

and counsel responded that he had "allegations which go to just about every phase of the trial from the original charging affidavit through the sentencing and appeal process." (P–C.R. at 353.)

The court asked Daniels, "[W]hat is outside the record that you're interested in?" (P–C.R. at 354.) Daniels responded that counsel had "more or less presented the case upon the issues that I wanted to present it, what the attorneys did not do, more or less ineffectiveness of counsel, he's not speaking directly to any Fourth Amendment issue[s]...." (P–C.R. at 354.) When asked for specific issues, Daniels again mentioned the Fourth Amendment and further commented "[c]oncerning my arrest," but then stated that if he provided more detail he "would be giving the prosecution an edge, so to speak." (P–C.R. at 354–55.) The post-conviction court told Daniels that it wanted to hear

> the evidence that's been prepared and then give you an opportunity to consult further with [post-conviction counsel] or perhaps even proceed on your own ... you will have an opportunity, we don't necessarily have to finish this thing today, it can continue until a time when I'm satisfied that you've had every opportunity to present whatever it is you choose to present, within the constraints and the confines of the law....

(P–C.R. at 355–56.) Although these statements were made at the beginning of the post-conviction hearing, which was held over three days during a four week period, the issue was not revisited.

More than a year later, Daniels filed a pro se "Motion to Waive Appeal." (P–C.R. at 343A–C.) The motion asserted that Daniels had been denied his right to pres-

represent him after the conclusion of the post-conviction hearing but before the motion to correct errors was filed. His retained counsel then filed a motion to correct error that did not include this allegation.

**11.** The State could not have kept from Daniels the truth about whether Rowley was present or not. Daniels has always known that.

ent errors during the post-conviction hearing, and claimed that Levy

refused to present errors or aid defendant in obtaining documents necessary for the needed investigation of defendant[']s cause. (4.) The acts of *all* the attorneys has grossly impaired the defendant. These very acts committed by counsel are designed to actually force the defendant into circumstances where by the time defendant gets his investigation under-way whatsoever may surface from said investigation will be deemed waived by a court of law.

(P–C.R. at 343A–B.)

As the U.S. Supreme Court observed in *Taylor v. Illinois,*

Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval.

484 U.S. 400, 417–18, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (footnote omitted). The Court explained that these "basic rights" include decisions regarding entering a guilty plea, waiving the right to a jury trial and waiving the right to be present during trial. *Id.* at 418 n. 24, 108 S.Ct. 646; *see also Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (recognizing that a defendant has "the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, ... take an appeal, [and] with some limitations, ... act as his or her own advocate") (citations omitted).

At issue here is counsel's selection of the issues to be raised in a post-conviction proceeding, which plainly does not fall in the ambit of these "basic rights" or "fundamental decisions" that must be made by the client. Rather, decisions regarding which issues to raise in a post-conviction

petition are more akin to determinations about the issues to be raised on appeal. In that context, the U.S. Supreme Court has made clear that appointed counsel on appeal does not have a constitutional duty to raise every colorable claim requested by the defendant. *See Jones,* 463 U.S. at 754, 103 S.Ct. 3308. Moreover, this Court rejected an argument similar to the one advanced by Daniels in this appeal in its opinion affirming the denial of Daniels' first petition for post-conviction relief, where Daniels requested that none of the issues raised be considered waived.

In support it is suggested that [Daniels] personally never waived any issue; rather, his attorneys did so over his objection and he should not be penalized for his attorneys' mistakes. The suggested approach would destroy any concept of finality in the appellate process. Decisions by counsel as to what issues will be raised, at trial and on appeal, are binding absent a finding of ineffective assistance.

*Daniels,* 528 N.E.2d at 783.

In sum, none of Daniels' claims is predicated on newly discovered evidence, and no claim of a *Brady* violation is raised. The first post-conviction challenge to the adequacy of Daniels' representation did not focus on the apparent lack of thoroughness on the part of trial counsel in pursuing the Rowley-related issues asserted here. Nevertheless, we adhere to the view that claims of ineffective assistance of counsel, if litigated at the initial post-conviction proceeding, are barred by the doctrine of res judicata in successive petitions for post-conviction relief, and any acts or omissions of trial counsel that were available in the first post-conviction proceeding but not raised are waived in a successive petition. This doctrine controls the disposition of this case.

■ *E. Daniels Has Not Presented a Case for an Exemption.* We also reject Daniels' argument that applying res judicata to his case would constitute a "mani-

fest injustice," *see State v. Huffman,* 643 N.E.2d ‚899, 901 (Ind.1994), or that his claims may be raised because they are based on fundamental error, *see, e.g., Barany v. State,* 658 N.E.2d 60, 64 (Ind.1995). We do not agree with Daniels' contention that he "has presented solid evidence that someone other than him may have committed the crimes for which he now faces execution." (Appellant's Br. at 80–81.) If that were the case, this Court could elect to address Daniels' claims on their merits rather than relying on procedural barriers such as waiver and res judicata. *Cf. Huffman,* 643 N.E.2d at 901 ("Finality and fairness are both important goals. When faced with an apparent conflict between them, this Court unhesitatingly chooses the latter.") Although the matters Daniels cites suggest some degree of ambiguity or uncertainty in some evidence, the testimony of Edmonds and four separate robbery victims makes it plain that Daniels received a sufficiently fair trial.

██ *F. Failure to Present Daniels' Social History at the Penalty Phase.* Daniels also contends that trial counsel were ineffective for failing to investigate and present his "social history" at the penalty phase of his trial. He lists seventeen claims that he asserts were available, had trial counsel conducted an adequate investigation.

The evidence presented at trial included the testimony of Daniels' mother, who addressed some of these seventeen items. She testified that she and Daniels' father divorced when Daniels was four years old, (T.R. at 1088), that Daniels was a "slow learner" in school, (T.R. at 1090), and that his reading level was "well below his [sic] average," (T.R. at 1094).

Daniels raised this same basic claim on appeal from the denial of his first petition

for post-conviction relief. His argument there comprised nearly ten pages of his brief. (S.P–C.R. at 2805, pp. 76–85.) Daniels' counsel pointed to evidence that Daniels "suffered from a learning disability and consequently had difficulty in school, that illnesses after his birth retarded his development and that he was a follower who could not say no when his friends suggested unlawful behavior." (*Id.* at pp. 79–80.) Daniels' counsel also indicated that there were other available family members and friends to testify against a jury recommendation for the death penalty. (*Id.* at p. 81.) This Court rejected Daniels' contention that trial counsel were ineffective for failing to investigate and present mitigating evidence.

> While in retrospect it is easy to say that defense counsel should have presented additional evidence in mitigation besides the testimony of appellant's mother, that testimony itself emphasizes that there may have been tactical reasons why additional witnesses were not called. As a result of statements made by appellant's mother, the prosecution was permitted to introduce a portion of appellant's juvenile record. Pitfalls exist in any strategy.... Without a specific significant mitigator being identified, the decision to call only appellant's mother cannot be deemed deficient.

*Daniels,* 528 N.E.2d at 780. An additional decade of investigating mitigators has not yielded substantially different or weightier material than we examined in 1988. For the reasons explained in Parts C. & D., *supra,* this claim is also barred by the doctrines of res judicata and waiver.[12]

## II. Ineffective Assistance of Appellate Counsel

██ Daniels also contends that the attorney who filed the motion to correct

---

**12.** Even absent res judicata and waiver, Daniels' claim would be tenuous. Trial courts are not required to treat evidence of a troubled childhood as a mitigating circumstance, *see Lowery v. State,* 547 N.E.2d 1046, 1059 (Ind. 1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990), and Daniels

does not explain how his social background is relevant to his culpability. *See Penick v. State,* 659 N.E.2d 484, 489 (Ind.1995) (upholding the trial court's determination that the defendant's "horrible, chaotic, abusive violent life" explained his crime, but neither justified nor excused that crime).

error after trial rendered ineffective assistance of counsel by "filing a motion to correct errors without first reading the transcript of the trial, thereby limiting the meritorious issues that could be raised on appeal." (Appellant's Br. at 64.) Daniels was represented at trial by court-appointed counsel but retained private counsel to file his motion to correct error. Daniels contends that retained counsel "was not aware of the lack of preparation of mitigation evidence or the failure to use exculpatory evidence at the guilt phase" and that retained counsel now believes that trial counsel provided ineffective assistance at the penalty phase. (*Id.* at 65.)

However, Daniels points to no errors on the face of the trial record that would have been found and included in the motion to correct error had counsel read the transcript. Indeed, although reading the transcript would certainly have apprised counsel of the limited nature of the penalty phase evidence, it would not have unearthed the mitigating evidence that Daniels now believes should have been presented. Moreover, if a claim of ineffective assistance of counsel had been raised in the motion to correct error and on direct appeal, Daniels would then have been precluded from litigating the issue in a post-conviction proceeding after a more thorough investigation.

The post-conviction court determined that this issue was waived because it was available but not raised in Daniels' first post-conviction relief petition.[13] *See* Ind. Post–Conviction Rule 1(8) ("All grounds for relief available to a petitioner under this rule must be raised in his original petition."). We agree.

### III. Ineffectiveness of Post–Conviction Counsel

As a final point, Daniels contends that the deputy state public defender who represented him at his first post-conviction hearing was ineffective for failing to investigate and present the evidence relating to Rowley and "available mitigation evidence" at the hearing. (Appellant's Br. at 66.)

To begin, we note that Daniels himself has contradicted his current claim that Paul Levy was ineffective as post-conviction counsel. When Levy testified during a successive post-conviction proceeding about his representation of Daniels, Daniels' then-current counsel questioned why Levy had not more vigorously pursued the issue of Daniels' mental competence. Daniels broke in, objecting "... it's totally unnecessary. Mr. Levy was a fine attorney." (S.P–C.R. at 2056.)

Levy testified during a successive post-conviction hearing that in retrospect he considered himself unqualified to have served as post-conviction counsel due to his lack of trial experience. (S.P–C.R. at 2064.) However, we held in *Wallace v. State,* 640 N.E.2d 374, 376 (Ind.1994), *cert. denied,* 514 U.S. 1115, 115 S.Ct. 1972, 131 L.Ed.2d 861 (1995), that "the filing of a post-conviction relief petition, even in a capital case, does not require a particular expertise in the trying of a capital case in its inception but rather requires a degree of skill in the manner in which post-conviction relief is presented to the trial court."

Levy went to work for the Indiana State Public Defender upon his graduation from law school in 1980. (S.P–C.R. at 2049.) By 1984, when he represented Daniels, he had become Deputy Chief Public Defender, handling primarily post-conviction relief petitions. (S.P–C.R. at 2048–49.) During his tenure as a public defender, which ended in 1986, he handled at least four other death penalty cases. (S.P–C.R. at 2095, 2120.) At that time very few other attorneys in the state handled death penalty post-conviction relief matters. (S.P–C.R. at 2125.)

Levy received training in death penalty post-conviction relief issues, and by his

13. The post-conviction court also found that, even if the issue were not waived, the claim fails because "appellate counsel's representation of Petitioner was in accord with the prevailing standards in the legal community at that time." (Appellant's Br. at 35.)

own description, he was given post-conviction case assignments because he was the "best and brightest" in the public defender's office. (S.P–C.R. at 2051–52, 2067.) During his career as a public defender, he handled hundreds of post-conviction relief petitions, many of which were successful. (S.P–C.R. at 2114–15.) Levy represented some of the most high profile death row inmates of the 1980's. *See, e.g., Resnover v. State,* 507 N.E.2d 1382 (1987); *Williams v. State,* 525 N.E.2d 1238 (Ind.1988) (Levy won new sentencing); *Brewer v. State,* 496 N.E.2d 371 (Ind.1986).

■ From a broader perspective, "[t]he right to counsel in a post-conviction proceeding is guaranteed neither by the Sixth Amendment of the United States Constitution nor article 1, § 13 of the Constitution of Indiana." *Baum v. State,* 533 N.E.2d 1200, 1201 (Ind.1989); *see also Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, and we decline to so hold today.") (citation omitted).

Daniels acknowledges that the performance of post-conviction counsel is reviewed under the highly deferential standard set forth as a matter of Indiana state law in *Baum v. State,* 533 N.E.2d 1200 (Ind.1989). In *Baum,* Justice DeBruler announced that we would review claims of ineffectiveness of post-conviction counsel under a standard that is

responsive more to the due course of law or due process of law principles which are at the heart of the civil post-conviction remedy. We adopt the standard that if counsel in fact appeared and represented the petitioner in a procedurally fair setting which resulted in a judgment of the court, it is not necessary to judge his performance by the rigorous standard set forth in *Strickland v. Washington.*

*Id.* at 1201 (citation omitted).

This Court applied the *Baum* standard in *Waters v. State,* 574 N.E.2d 911 (Ind. 1991), and reversed the denial of a petition for post-conviction relief. In *Waters,* the defendant/petitioner filed a pro se petition; counsel filed an appearance one month later; and the post-conviction court ordered the evidence submitted by affidavit. *Id.* at 912. The petitioner submitted the affidavits pro se, and counsel submitted nothing on behalf of the petitioner, save a petition for instructions, because the State filed no counter-affidavits or other evidence. *Id.* The post-conviction court denied relief, finding that the pro se affidavits were inadequate for various procedural and technical reasons. *Id.*

■ This Court observed that post-conviction "counsel should have known that the affidavits were technically inadequate and should have taken the necessary steps to present them to the trial court in an acceptable form. Counsel, in essence, abandoned his client and did not present any evidence in support of his client's claim." *Id.*[14] This is not the case here.

---

**14.** *See also Patton v. State,* 537 N.E.2d 513, 517 (Ind.Ct.App.1989), which Daniels cites for support. In *Patton,* the Court of Appeals granted a petitioner relief under the *Baum* standard. The defendant/petitioner challenged a 1973 guilty plea through a petition for post-conviction relief. The transcript of that guilty plea hearing was either lost or destroyed. *Id.* at 517. Although counsel was apprised at the post-conviction hearing of the procedures to be followed in such circumstances, counsel made no effort to reconstruct the record or establish that reconstruction was possible. Id. at 515 (citing *Zimmerman v. State,* 436 N.E.2d 1087, 1088 (Ind.1982);

Ind. Appellate Rule 7.2(A)(3)(c)). In finding a *Baum* violation, the Court of Appeals observed that post-conviction counsel "made no effort to present to the court ... the facts from which the court could determine the only critical issue before it. We do not believe this was a 'procedurally fair setting' because, in essence, the court had no record before it from which it could review Patton's claim." *Patton,* 537 N.E.2d at 519–20. In contrast to *Patton,* the record from Daniels' trial, upon which his claim of trial counsel ineffectiveness is predicated, was submitted to the first post-conviction court.

Daniels' post-conviction counsel filed a fifteen-page petition that raised seven separate claims, many with multiple parts, and presented nine witnesses at a three-day hearing. (P–C.R. at 21–35, 369–576.)

The post-conviction court found that "even if the standard of performance of counsel described in *Strickland* were applicable, post-conviction counsel's performance was not ineffective in that his representation was in accord with prevailing standards in the legal community at that time." (Appellant's Br.App. at 35.) Our review of the record does not lead unerringly and unmistakably to an opposite conclusion; therefore, we affirm the judgment of the post-conviction court. *See Harrison v. State,* 707 N.E.2d 767, 773 (Ind.1999), *cert. denied,* 529 U.S. 1088, 120 S.Ct. 1722, 146 L.Ed.2d 643 (2000).

## Conclusion

We affirm the denial of Daniels' successive petition for post-conviction relief.

DICKSON and SULLIVAN, JJ., concur.

BOEHM, J., dissents with opinion, in which RUCKER, J., joins.

BOEHM, Justice, dissenting.

I agree with the majority's recitation of the well settled principles of waiver and res judicata. 741 N.E.2d at 1184–85. I also agree that this case boils down to "the dilemma between the dual goals of ending litigation and ensuring only proper imposition of the death penalty." *Id.* at 1184. However, I believe the majority places too high a premium on finality and discounts evidence that suggests Daniels may not

have been the perpetrator of these horrendous crimes. This evidence was not presented at Daniels' trial and was also completely ignored by postconviction counsel. Although the successive postconviction court found the evidence persuasive, invocation of waiver precludes its consideration by any court. I would adhere to the principle embraced by this Court in *State v. Huffman,* 643 N.E.2d 899 (Ind.1994), also a death penalty case. We held there that "[f]inality and fairness are both important goals. When faced with an apparent conflict between them, this Court unhesitatingly chooses the latter." *Id.* at 901. For the reasons explained below, I believe the unusual facts of this case demand an exception to the general waiver and res judicata principles.

### A. *The Evidence*

The State's theory at trial was that the robberies were committed by Daniels, Kevin Edmonds, and Donald Cox. Defense counsel focused their efforts on discrediting the testimony of Edmonds and did little to question the identifications by the robbery victims. Daniels correctly asserts in this appeal that trial counsel had available to them a wealth of information that suggested that Rowley, not Daniels, might have been the gunman during the robberies. Daniels points to a number of specifics. Rowley and Cox were charged with a robbery with a similar modus operandi four days before these offenses.[1] Timothy Streett, the son who witnessed his father being shot, tentatively identified both Rowley and Daniels as possible participants.[2] The daughter from the third

1. Rowley was convicted of that earlier crime. *Rowley v. State,* 271 Ind. 584, 394 N.E.2d 928 (1979). It is unclear on this record whether Cox was convicted.

2. Daniels also points to the following statement by a deputy prosecutor at a pretrial hearing in his case with respect to lineups at which apparently fifteen witnesses were called: "Certain witnesses did not pick out [Daniels], either picked out someone else or

picked out another person. Some of those sheets no one exactly knows where they are. . . . [T]he State will stipulate that certain witnesses did not pick [Daniels] out, and in certain instances witnesses picked other persons out." We are not told to which witnesses this refers, and what the discrepancies were. The prosecutor earlier stated. "A great many persons viewed a line-up for a variety of crimes that night." It is unclear how fifteen potential witnesses were identified

robbery initially identified Daniels in a line-up, but only after his picture had appeared in the newspaper. She later called a deputy prosecutor and stated that she was "not real sure anymore" about the identification, but nonetheless confidently identified Daniels at trial. The fourth robbery victim, who testified at trial that he was positive of his identification of Daniels, had previously told a detective who showed him an array of photographs that he could not identify the perpetrator but narrowed it down to Rowley and Daniels. Before Edmonds implicated Daniels, he had suggested to police, in response to Rowley's pointing a finger at him, that Rowley's knowledge of the robberies suggested Rowley was present when they took place. In a polygraph interview of Rowley two weeks after the crimes, the examiner detected "deceptive responses." According to the polygraph report, Rowley, in response to subsequent questions, then "confessed" to the first robbery, although it is unclear precisely what this means and the audiotape of the interview no longer exists.[3] Rowley was initially charged with the Streett murder. According to the probable cause affidavit, this charge was based on Timothy Streett's identification of Rowley "as being with the person" who shot his father. Finally, shell casings fired from the same gun as the shell casings found at the murder scene and the scene of the fourth robbery were recovered during a search of Rowley's home.

Daniels contends that his trial counsel were ineffective for failing to present this evidence suggesting that Paul Rowley, and not Daniels, may have committed the crimes at issue in this case. The postconviction court found no prejudice as to the guilt phase, and I agree with the majority's affirmance of the successive postconviction court's judgment on that point. However, I reach a different conclusion regarding the penalty phase.

All of the robbery victims testified that they saw two robbers and only one wielded a gun. Edmonds testified that he was with Daniels, who carried the gun throughout the evening, while Cox remained in the car. The State's theory of the case, from opening statement to verdict, was that Daniels, Edmonds, and Cox were the only participants in the crime spree. Daniels argues, and I agree, that the cited evidence suggesting Rowley's presence, and even the possibility that Rowley was the shooter, left at least a "residual doubt" as to whether Daniels was the shooter.[4]

### B. Performance of Trial Counsel

This case was tried in 1979—long before Criminal Rule 24 was adopted. That Rule requires death penalty trial counsel to meet significant training, educational,

---

when the accounts of the robberies place only six surviving victims at the scene.

3. Although the audiotapes of the polygraph interview were erased, the report notes that Rowley stated that he, Cox, and Edmonds "stuck someone up (note: the victim beat [Edmonds] off with a b[r]oom). The elements of this crime (the broom) occurred on the same night of the shooting under investigation...." Daniels further contends that Rowley "confessed" in that same interview "to having the gun in his possession on the night of the shooting. Further results of the tests showed that he did shoot someone on the night of January 16, 1978." This language appears in handwritten notes dated January 30, 1978, which were attached to a deposition admitted into evidence at the postconviction hearing. The deposition was that of a detective who stated that the handwriting "appear[ed] to be" his.

4. Daniels also suggests that trial counsel were ineffective for failing to make a penalty phase argument based on residual doubt. The majority correctly notes that we recently held in *Miller v. State*, 702 N.E.2d 1053, 1069 (Ind. 1998), cert. denied, 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000), that "counsel ought have no obligation to argue to the jury that its just-returned unanimous determination of guilt ought be revisited.... The failure to argue 'residual doubt' does not constitute ineffective assistance of counsel." Here, however, the failure of counsel is not merely the failure to argue to the jury that its verdict may have been incorrect. The failure is in omitting to present the evidence suggesting that possibility.

and other requirements, and provides for resources to defense counsel that were unavailable in 1979. Although the performance of counsel is evaluated under prevailing professional norms of the time, the postconviction court was justifiably appalled by the performance of counsel and found that their omissions as to the penalty phase of this trial were deficient and prejudicial, even by 1979 standards. It found that "in several areas they did a deplorable job." The first of these identified by the postconviction court was the failure to cross-examine eyewitnesses. This is at least arguably attributable to trial strategy to avoid appearing callous to victim-witnesses. The second item, however, goes beyond the questionable and enters the realm of the incomprehensible. The postconviction court identified several pieces of evidence suggesting that Rowley, not Daniels, was the shooter, all of which were never put before the jury at trial. It found it

> inconceivable with the trial strategy indicated by trial counsel that no police officers were called to testify about multiple identifications by Timothy Streett; about Paul Rowley's confession .to involvement in the [first] robbery; and about shell casings found at Rowley's home that matched the shell casings found at the scene of the Streett murder and Barnett attempted robbery/shooting, all of the above information was either in the Court file, in exhibits attached to pleadings filed by trial counsel themselves, or readily available to them with minimal investigation.

As this Court recently observed in *Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000), Criminal Rule 24, which became effective January 1, 1990, now "creates minimum standards for the criminal litigation experience, specialized training, compensa-

tion, and caseload of lawyers appointed in capital cases." Prosecutors and defense attorneys agree that "Rule 24 ha[s] led to improved representation by defense lawyers in capital cases." *Id.* (quoting Norman Lefstein, *Reform of Defense Representation in Capital Cases: The Indiana Experience and Its Implications for the Nation,* 29 Ind. L.Rev. 495, 509 (1996)). "[A] death penalty verdict returned [since the advent of Rule 24 is] more likely to be sustained on appeal, and the appellate court [is] less apt to find that defense counsel was ineffective." *Id.*

### C. Performance of Postconviction Counsel

These seemingly glaring omissions of trial counsel were repeated in the first postconviction proceeding. Daniels was represented in the 1984 proceeding by Paul Levy. Levy testified at the successive postconviction hearing that Daniels' case was among the first two or three death penalty postconviction cases in Indiana after the reinstatement of the death penalty. At the time, Levy was the only person in the State Public Defender's Office who was working on such cases. When he filed the petition for postconviction relief in February of 1984, he had less than four years experience as a lawyer, and a predominant part of this experience was reviewing guilty plea transcripts to see if they were in compliance with *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and the Indiana statutory requirements for a guilty plea.[5] Levy testified that he "had no experience doing a factual investigation of a case" and that he "had never worked with an investigator." He testified that he did not recall obtaining the files of trial counsel in the case, and he either did not recall or did not review the trial court's file. The only

---

5. The majority notes, "During his career as a public defender. [Levy] handled hundreds of post-conviction relief petitions, many of which were successful." 741 N.E.2d at 1190. I fail to see how reviewing and litigating hundreds of guilty pleas in which a trial judge failed to give a specific statutory advisement would have equipped Levy to conduct the necessary factual investigation to litigate the complex capital postconviction relief petition at issue in this case.

thing Levy could confidently say he had done was review the record of proceedings from trial. Indeed, Levy testified that he "didn't do much of my own factual investigation beyond the reading of the trial transcripts," and that "if I had known about other evidence that could have cast doubt on the reliability of the identification of Michael Daniels as the murderer in this case, I would have pursued it. But did I investigate and look for that? No." Finally, Levy testified that part of the reason he left his job with the State Public Defender a few years later was "a growing sense of unease that I wasn't doing my job very well."

It appears that Levy viewed his role as essentially a second appellate attorney. However, as this Court observed in *Woods v. State,* 701 N.E.2d 1208, 1216 (Ind.1998),

> expecting appellate lawyers to look outside the record for error is unreasonable in light of the realities of appellate practice. Direct appeal counsel should not be forced to become a second trial counsel. Appellate lawyers may have neither the skills nor the resources nor the time to investigate extra-record claims, much less to present them coherently and persuasively to the trial court.

Postconviction counsel is not to function as another appellate attorney. In *Woods,* we noted the importance of conducting a factual investigation and developing extrinsic

evidence to support many claims of ineffective assistance of counsel. *Id.* at 1216. This was recently again emphasized by the United States Supreme Court in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1515–16, 146 L.Ed.2d 389 (2000), in the context of omitted mitigating evidence. It is equally true of the Rowley-related evidence, which would have required Levy to develop and present evidence beyond the face of the trial record to establish ineffective assistance of counsel.

As noted above, had Criminal Rule 24 been in effect at the time of Daniels' trial, much of the Rowley evidence would likely have been presented to the jury. For many years the State Public Defender's Office has been equipped to identify errors of the magnitude of those that occurred here and raise them in the initial postconviction proceeding.[6] The briefing in this and other cases demonstrates that capital postconviction counsel in recent years conduct a very thorough factual investigation and appear to raise every conceivable issue as grounds for postconviction relief. The contrast between Daniels' initial postconviction proceeding and those of later years is stark.

Although many capital cases present virtually irrefutable physical and testimonial evidence of guilt, guilt in this case is based on the testimony of a co-defendant who

---

6. Beginning in 1985, the State Public Defender's Office has assigned at least two attorneys to each death penalty case. *Annual Report of the State Public Defender Fiscal Year 1986–87* 13 (1987). In 1986, the Office created a Death Penalty Task Force to provide ongoing training in areas related to capital litigation. *Id.* at 13. It also instituted procedures for meaningful supervision of death penalty cases by requiring that attorneys handling capital cases attend a minimum of eight meetings at different stages of litigation. "The purpose of the stage meetings is to provide guidance on capital issues and strategies, to ensure that all allegations are raised, and to provide supervision when warranted." *Id.* at 14. These improvements were presumably in response, at least in part, to the observation that capital postconviction cases require "review of voluminous appellate records, police reports, trial

discovery, prior counsel's files, appellate briefs *and* investigation of issues and witnesses *not* previously presented...." *Id.* at 10 (emphasis in original).

In the early 1990s, a separate Capital Division was created. It consisted of a Chief and Assistant Chief Deputy, two case supervisors, a resource manager, six capital litigation attorneys, two investigators, one "mitigator," and three law clerks. *Report of the Office of the State Public Defender Fiscal Years 1988–89, 1989–90, and 1990–91* 24, 59 (1991). According to the most recent published report, the Capital Litigation Division, which has downsized in recent years because of a reduced caseload, now employs seven full-time attorneys, one investigator, two "mitigators," and two law clerks. *Public Defender of Indiana 1999 Annual Report* 19 (2000).

testified pursuant to a plea agreement for a reduced charge and eyewitness victims, some of whom had previously identified Rowley or others. Trial counsel had available, but failed to use, a substantial body of information suggesting that someone else may have committed the crimes for which Daniels was charged. Postconviction counsel added nothing, with the result that no court considered these points until the second postconviction proceeding in 1997.

### D. *The Postconviction Court's Findings*

The evidence the majority cites is surely enough to sustain a conviction, but I cannot exclude the possibility that the omitted evidence could have affected the sentence. The second postconviction court concluded that it would have. After a lengthy hearing at which the omitted Rowley evidence was presented and trial counsel and Levy testified about their performance, the second postconviction court found that "had trial counsel done a fully professional job the residual doubt which would have been placed with the jury and the Judge would have created a reasonable probability that the recommendation would have been different and a reasonable probability that the Judge would not have imposed the death penalty." Because this is ultimately a factual determination, this Court will reverse only upon a showing of "clear error"—that which leaves us with a definite and firm conviction that a mistake has been made. *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995). The postconviction court's finding that, but for trial counsel's omissions the death penalty would not have been imposed, is not clearly erroneous. Nevertheless, the postconviction court quite correctly viewed itself as barred by our pronouncements that a prior postconviction try at ineffective assistance precludes revisiting that issue, and accordingly denied relief.

### E. *The Need for an Exception to the Usual Res Judicata Waiver Rules*

This case thus presents a case in which (1) the death penalty was imposed; (2) the trial was conducted before Criminal Rule 24; (3) there was minimal investigation; (4) postconviction counsel was inexperienced and conducted no factual investigation; (5) subsequent investigation revealed exculpatory evidence; and (6) a subsequent postconviction court found the omitted evidence sufficient to render the death penalty unreliable. In light of the adoption of Criminal Rule 24 and the dramatic improvements in capital postconviction representation by the State Public Defender, I trust this case presents a set of circumstances that will recur infrequently. But given the woeful performance at the initial postconviction proceeding, I cannot prioritize the powerful reasons favoring finality over the concern that the death penalty may have been imposed not for the defendant's acts, but for counsel's oversights.

Accordingly, I believe this Court should consider the merits of Daniels' claim of ineffective assistance of trial counsel based on inadequate investigation of and failure to present the Rowley evidence. Giving due deference to the factual determinations of the successive postconviction court, I would affirm the denial of relief as to the convictions but reverse the denial of relief as to the penalty phase.

RUCKER, J., concurs.